reassigned badge numbers. The absence of any remedy for this group of individuals is in deference to the City's right to be protected against an excessive remedy impact when the Union failed to act on its rights for nine years.

5) Current vacation cycle assignments will not be disturbed, and newly assigned badge numbers based upon this Award will be utilized in the next vacation selection cycle.

6) Current shift assignments will not be disturbed, and newly assigned badge numbers based upon this Award will be utilized for the next round of shift assignments. The City may not avoid the consequences of this Award on shift assignments by unduly delaying the next round of shift assignments.

7) I will retain jurisdiction in this case over any questions concerning implementation of this Award.

*[signature]*

Richard G. Higgins
Arbitrator

DATED: June 25, 2004

**IBPO, LOCAL 364**

— and —

**CITY OF SPRINGFIELD**

Arbitration: Badge Numbers

---

In late February/early March, 2004, the parties notified me, Richard G. Higgins, that I had been selected as Arbitrator in the above-referenced case. On March 4, the parties informed the Arbitrator that the hearing was confirmed for April 6, 2004. At the April 6, 2004 hearing, the parties presented evidence, testimony and argument. By mutual agreement, the parties left the record of hearing open, and subsequently additional documents, including a number of affidavits, were submitted. Briefs were submitted to the Arbitrator and received on June 5, 2004.

Appearances for Parties:   Kevin B. Coyle, Esq.
                           For the Union

                           Peter M. Murphy, Esq.
                           For the City

**THE ISSUES**

At the hearing, the parties stipulated that the Issues in dispute are as follows:

1) Is this case arbitrable?

2) Did the City violate the Collective Bargaining Agreement by the manner it assigned Badge Numbers after July 1, 1995?

   If so, what shall be the remedy?

## STIPULATION

At the arbitration hearing, the parties stipulated to the following:

> That the Civil Service Certification Lists e.g. Joint Exhibits 4, 5 and 6, in the Union's words "are", and in the City's words "appear to be" the "civil service list" referred to in Section 7.02 of Joint Exhibit 1.

## RELEVANT CONTRACTUAL PROVISIONS

### Joint Exhibit 2
### 7/1/91-6/30/94 Collective Bargaining Agreement

> 7.02  So far as not in conflict with General Laws, it shall be the practice, for the purpose of establishing seniority, to list in the appointment book as a regular full-time member of the department in the order in which the members scored their exam grade by officers entering on the same day.

### Joint Exhibit 1
### 7/1/00-6/30/03 Collective Bargaining Agreement

> 7.02  So far as not in conflict with the General Laws, seniority among employees who are appointed and complete recruit training academy on the same date, shall be based in the order of the civil service list from which the applicants are appointed. This paragraph shall apply to the employees appointed after July 1, 1995 and shall not affect the seniority of employees previously appointed whose seniority was computed in accordance with criteria then in effect. If this paragraph is determined to be invalid by a final determination of any court of administrative agency, the parties to this agreement shall commence negotiations on a new criteria for seniority among employees who are appointed and complete recruit training on the same date.

## THE DISPUTE

The parties seem to be in agreement on the majority of facts and events leading up to their current dispute. During this recitation of the background of the dispute, I will take note of certain areas where the parties are in disagreement.

As can be seen from the above-quoted excerpt from the 1991-1994 CBA, seniority for officers entering on the same day was to be "...in the order in

which the members scored their [Civil Service] exam grade...." Both parties acknowledge that for a number of years prior to 1995, the Civil Service "exam grade" was actually not being provided as part of the Civil Service List procedure.

At the arbitration hearing, Officer Richard D. Trombley testified that he was Local Union President from 6/1/95 until June 2001. He testified that in negotiations during 1995 for a successor to the 1991-1994 contract, the Union raised the issue of Section 7.02 in order to develop some sort of structure or procedure for assigning seniority. He testified that at one point the negotiating parties considered utilizing Police Academy scores to assign seniority. However, the Chief of Police had expressed some concern about how elements of the Academy scoring, such as physical education, would affect women candidates. The net result of the 1995 negotiations was that the parties agreed to the language shown above from Joint Exhibit 1, assigning badge numbers/seniority "...based in the order of the civil service list from which the applicants are appointed."

At the arbitration hearing, both parties acknowledged that for all periods at issue in this case (i.e. 1995 to the present day), the City of Springfield and its Police Department have been subject to the terms of a "Consent Decree" entered into as part of a lawsuit known as *Castro v. Beecher*. Neither party entered a document into evidence which provided the exact language of said Consent Decree. Both parties, however, agreed that the essence of that Consent Decree was that the Springfield Police Department would engage in a hiring procedure resulting in "one for one" hiring of minorities and majorities. Certain exceptions existed to this rule, such as candidates who were former Police Cadets or individuals whose parents had been killed in the line of duty. For purposes of this arbitration case, those exceptions do not appear to be part of the dispute before me, and hence I will make no rulings on those exceptions beyond directing that the exceptions be respected, as called for by the Law, when and if I determine a remedy is appropriate in this case. Both parties agree that in the 1995-1996 mayoral race, a commitment was made by a candidate (soon to be mayor) to hire 100 new Police Officers. At the time, even before hiring any new Officers, the Department was apparently running below authorized strength. Apparently, in fulfillment of that campaign promise, approximately 40 Officers were graduated from the Police Academy in 1996; 52 in 1997; and 60 in 1998. The orders from the Deputy Chief announcing the graduation and assignment of badge numbers to those three classes were introduced at the arbitration hearings as City Exhibits 1, 2 and 3 respectively.

5

At the arbitration hearing, Capt. William Cochrane testified that in 1996, holding the rank of Lieutenant, he was assigned as the Officer in Charge of the Police Academy, and remained in that position until 2001. Capt. Cochrane testified at length concerning the various lists, forms, and reports issued either by Civil Service or prepared at the Academy itself. He testified that for the three large classes mentioned above, Civil Service would, upon request from the City, provide a list of "residents" who had already taken the Civil Service test and were ranked based both on their test scores and further on a one-for-one basis. Apparently, in conformance with *Castro v. Beecher*, Civil Service would send a list to the Springfield Department compiled by taking the top candidate, be it majority or minority, and then alternating back and forth (majority, minority, etc.). For example, if the top five candidates based on test scores were minority, and the second five were all majority, that initial Civil Service List would be compiled by taking #1, a minority, followed by #6, a majority, followed by #2, a minority, followed by #7, a majority, etc. Capt. Cochrane testified that Civil Service would provide a number of names equal to two times the number of slots the City envisioned filling. This larger number of names was in anticipation of a variety of subsequent events which would eliminate certain individuals from candidacy. Capt. Cochrane testified that this original list would be narrowed down when and if certain candidates either failed to respond to notification they were on the list or, in responding, indicated their unwillingness to accept the position. Of those remaining, Academy staff would conduct background checks, and certain types of items in an individual's record would eliminate them from consideration, thereby further reducing the list. One of the next steps in the process would be an interview by the Board of Police Commissioners. Based on those interviews, certain candidates would be given a conditional offer of employment. Those so offered would then undergo physical exams, physical aptitude tests, and psychological tests.

Capt. Cochrane testified that when the investigation/interview/testing process was completed, individuals who were still active candidates were then a second time arranged on an alternating one-for-one basis. Thus, if from the original candidates a disproportionately large number of one group (majority or minority) had been eliminated, then those gaps in a one-for-one list would be repopulated by moving individuals up to re-establish the one-for-one sequence.

Both parties appear to be in full agreement that when the above process was completed, the hiring of Police Officers for the City of Springfield for those three large classes was in fact on a one-for-one basis in conformance with *Castro v. Beecher*.

6

The problem in this case arose when it came time to assign badge numbers to the members of those three large Academy classes. In Springfield, badge number equates to seniority. Capt. Cochrane testified that he had been told that badge numbers should be assigned in order based on the one-for-one ranking essentially as Officers were listed on Form 14, which was the last one-for-one document prepared after candidates had been eliminated due to background checks, interviews, or other reasons. Capt. Cochrane testified that he had been given that information from Lt. Finn, who was the "Chief's Aide" and who Capt. Cochrane said had "...overseen some of the previous lists...." Capt. Cochrane testified that he was assisted in this list preparation by a number of Officers assigned to the Academy, including Officer Shawn Kearney. He testified that he and Officer Kearney were primarily responsible for preparation of both Form 14s and for the assignment of badge numbers.

At one point in testifying concerning the impact that the Collective Bargaining Agreement might have had on his Academy procedures, Capt. Cochrane testified:

> I wasn't concerned with the Union Contract at the time because they weren't Union employees. I don't know if that was the right thing to do, but at the time the Union didn't come in to sign them up to be Union members until the end of the Academy. So at the beginning when these lists were generated I really wasn't looking at the union contract to try to clarify how I should set up the list other than Castro v. Beecher and the direction I had been given by Lt. Finn.

The net effect of the procedures utilized by the Police Academy and the Springfield Police Department was that individuals graduating in those three large Academy classes received badge numbers and were ranked in seniority based upon their location on the last "one for one" list compiled after candidates had been eliminated from the original Civil Service List for various reasons. Thus, an individual who was moved up past certain other individuals on the original Civil Service List in order to occupy a vacant one-for-one slot received a badge number giving that individual more seniority protection and benefits than the individuals above him/her on the original Civil Service List who he/she passed in order to fill that vacant one-for-one slot. Both parties seem to be in agreement that if Section 7.02 had been followed as written, the exact same number of minority and majority Officers would have been hired, but their relative seniority would have been based solely upon their relative location on the original Civil Service List versus their position on the final one-for-one list.

In early 2003, the Springfield Police Department had a major layoff of approximately 75 Police Officers affecting the entire 1998 Academy class. Union President Scanlon testified that when he took over on June 1, the

7

"...effects of the layoff hit home for everybody and they had all been displaced or either laid off or moved from shift to shift."

Local Union President Scanlon testified that, shortly after he became President on June 1, 2003, an Officer Zarrelli approached him and raised the issue of how badge numbers/seniority had been assigned and how Civil Service lists had been utilized in that process. President Scanlon testified that he informed Officer Zarrelli that when someone brought him a complaint he expected that person to do leg work to gather information. He testified that Officer Zarrelli did just that.

President Scanlon testified as follows:

> He (Zarrelli) came back to me with some pretty explicit work and he showed me where the roster the Department issued had people, and what he thought the actual list should look like based on what he got from Civil Service. I took that information and started my own investigation.

Union Exhibit 1 and Union Exhibit 2 are August 10 and September 4, 2003 letters from Attorney Coyle, representing the Union, to the Board of Police Commissioners, requesting "...copies of all certifications from which police officers have been appointed since July 1, 1995." On October 31, 2003, Attorney Coyle wrote to Chief Meara noting that the Chief planned "...to do a badge change within a week or two" and informing the Chief that the Commissioners had yet to respond to the Union's request for information. (Union Exhibit 3) Union Exhibit 4 is a December 2, 2003 letter from Collective Bargaining Agent Clement P. Chelli to Attorney Coyle stating, "Enclosed for your review is material, received this date from the Springfield Police Department, which you requested regarding appointments." Local President Scanlon testified that he reviewed the received information and concluded that "...people are out of (seniority) order."

Both parties acknowledge that there were a number of meetings between Union representatives and Attorney Murphy representing the City in an attempt to ascertain both what the badge number/seniority list would look like if the original Civil Service certification list had been utilized, and the impact of moving persons to badge numbers utilizing said list. At the arbitration hearing, the Union acknowledged that Attorney Murphy never claimed to have authority to resolve the matter, and that the Union understood that the Board of Police Commissioners had the final say.

Timothy Ryan, Esq. testified that he is the Chairman of the Police Commission. He testified that the issue of badge numbers/seniority was initially addressed by the City Council and subsequently, on February 23, 2004, by the Commissioners. He testified that in executive session, the Commissioners

8

listened to the Union's presentation and "...unanimously voted not to grant the request." Mr. Ryan testified that one of the reasons for denying the request was that the Commission felt it was "untimely." He testified that the Commissioners were also concerned about the effect of yet another reorganization following the major reorganization associated with the layoff. He testified that there was "...also some concern that the issue was being used, fairly or unfairly, as a racially polarizing event." He testified that he reached that conclusion based on the fact that the individuals attending the Council and the Commissioner's meetings who appeared to be in opposition to the Union position were all minorities. On cross-examination, Attorney Ryan was asked if he had "received any phone calls from minority officers in the 1998 class that stood to gain seniority..." if the Union position was adopted. He answered, "No."

At the arbitration hearing, the Union presented as its Exhibit 10 a document entitled "Effect of Correctly Implementing § 7.02 on Whites/Minorities." It shows that for the Class of 1996, if the Union position were implemented, 18 majority Officers and 2 minority Officers would have "higher seniority," while 15 minority Officers and 2 majority Officers would have lower seniority. It shows for the Class of 1997 that 17 majority Officers and 0 minority Officers would have higher seniority, while 0 majority Officers and 10 minority Officers would have lower seniority. By contrast, for the Class of 1998, the class which absorbed most of the layoffs, it shows that 12 minority Officers and 1 majority Officer would have higher seniority, while 18 majority Officers and 1 minority Officer would have lower seniority. In that same regard, Local President Scanlon testified as follows:

> Q: On the impact which has been the subject of a number of questions, in relation to how it affects people by race in each of these classes, if the Contract language was followed and the revised Seniority list was implemented how would that affect the people who are still laid-off awaiting recall in terms of who would benefit?
>
> A: It would predominantly benefit Black and Hispanic Officers. They would come back at a quicker rate than they would unless it was changed. Black and Hispanic officers would come back sooner if we followed the Contract provision.

Joint Exhibit 8 contains a Grievance Complaint Form dated February 24, 2004 and stating in pertinent part:

> NATURE OF COMPLAINT: Since July 1, 1995 numerous employees who were appointed and and completed recruit training on the same date were assigned badge numbers in violation of §7.02 of the contract.

9

REQUESTED REMEDY: Reassign badge numbers to such employees as provided by §7.02 of the contract, and make whole any individuals who suffered loss as a result of the violation.

Local Union President Scanlon testified further concerning the impact of granting the Union's grievance when he stated, "The union position is that it wouldn't affect Vacation until the next cycle. That would cause an administrative nightmare if we redid Vacation at this point in time."

Shortly after the filing of the above-quoted grievance, the parties informed me that I had been selected as Arbitrator in this case. It is the above-outlined dispute which is before me in the form of the Stipulated Issues shown above.

## POSITIONS OF THE PARTIES

*Arbitrator's Note:* *Rather than devoting a separate section to each Stipulated Issue, I am going to present each party's position in a single section. The nature of the City's "arbitrability" issue is that it lends itself to being presented in the context of the entire dispute.*
*In presenting the positions of the Union and the City, I have chosen to do so by quoting extensively from the written brief submitted by each party. Those briefs are of manageable length, and paraphrasing could not but detract from their clarity and succinctness.*

### POSITION OF THE UNION

#### A. The grievance is arbitrable.

The City disputes the arbitrability of the grievance for being untimely.

##### 1. The grievance was filed within the time limits from when local 364 had knowledge of the grievance.

The collective bargaining agreement provides in §5.01 that grievances must be filed "...within ten days of the date of the grievance or...knowledge of its occurrence."

The history of the dispute is not in significant dispute, and recited above.

10

Once the lists were obtained in December 2003, Local 364 and the City proceeded with due diligence. All agreed that §7.02 had not been followed, and the correct order of badge numbers was determined. Indeed it was not expected that a grievance would be necessary as the City gave every indication that it intended to remedy the violation of 7.02 voluntarily. It was not until February 23, 2004 that the City finally took grievable action, at which time the Board of Police Commissioners voted to not revise the badge numbers to correct the undisputed failure of the City to comply with §7.02. Local 364 filed its grievance the next day.

"If the parties are engaged in meaningful discussions about the matter at issue, arbitrators will toll the time limitations for filing a grievance." ***Labor and Employment Arbitration,*** Bornstein, Gosline and Greenbaum, Matthew Bender, §8.03[6][b]. The grievance was timely.

The City may assert that the ten day period for filing grievances began running in June or July of 2003 when Zarrelli approached Tom Scanlon with the possibility, based on his six year old recollection of the order of names on the appointment list, that §7.02 had not been followed. This is not "knowledge" as that term is used in §5.01. It was entirely reasonable of Scanlon to tell Zarrelli that he was not going to launch a time consuming inquiry regarding a potentially disruptive matter based only on an aging memory. Once it appeared that there was some corroboration of Zarrelli's memory, Local 364 began formally investigating the matter. The City was woefully unresponsive, taking four months and repeated requests to provide the documents it later asserted to be "readily available".

Local 364 took timely action to investigate a possible violation of §7.02, and filed its action in a timely manner once the grievable event occurred.

## 2. The assignment of badge numbers in violation of §7.02 is a continuing grievance

It is generally recognized that some contract violations continue, and reoccur at each erroneous application of the contract provision. ***How Arbitration Works,*** Elkouri and Elkouri; co-editors, Edward Goggin, Marlin, M. Volz, BNA (5th Ed.) p. 281; ***Labor and Employment Arbitration,*** Bornstein, Gosline and Greenbaum, Matthew Bender, §8.03[5].

The most common example of a continuing grievance is an error in rate of pay. The fact that an employee does not notice that he is being paid at the wrong rate of pay for some time, does not doom the employee to receive the wrong rate of pay forever. Even if it is weeks, months or years after the initial violation, the employee may still grieve the rate of pay. In effect, every paycheck

11

is a new grievable violation. His belated awareness of the error may affect his claim for back pay[12], but certainly he could grieve and obtain relief prospectively.

The dispute presented in this arbitration is of the same nature, as every exercise of seniority, if it is wrongly calculated, is a new violation. *Id.*, citing **Bethlehem Steel Co.**, LA 538 (Seward 1954)

The assignment of the wrong badge number is a continuing grievance. There is no reason to continue to deprive members of Local 364 the badge number which Local 364 and the City have agreed they should have, simply because that agreement was not followed when the badge numbers were first assigned. The error has been found and must be corrected. While it will undoubtedly be distasteful for some officers to lose the precedence which they should never have enjoyed, it is surely distasteful to the officers who bore the burden of the error for some years, to now contemplate the more favorable vacation dates, shifts, etc. that they lost for all the years the violation was not known.

### B. *The City failed to follow the provisions of §7.02.*

Whereas parties to a grievance arbitration normally hotly contest the occurrence of a violation of the agreement, there is no serious dispute in this case. The badge numbers assigned to the groups of officers appointed on October 15, 1996, April 6, 1997 and July 13, 1998 were not assigned according to the terms of §7.02.

### IV. REMEDY

Local 364 requests as a remedy, that a finding be made that the City violated the provisions of §7.02 in assigning the disputed badge numbers, and that the City be directed to reassign badge numbers in accordance with §7.02.

(Union Brief, p. 7-10)


## POSITION OF THE CITY

On February 25, 2004 the Union held a meeting of members at the Springfield Police Department. (Affidavits of Patrolmen, City Exhibit). At the meeting, union member Thomas Zarrelli indicated to all members in attendance that in December of 2002 he had told former Union President Edward McDonald that the seniority as listed on the annual roster was incorrect. (Affidavits of

---

[12] Indeed, most employers would not seek to profit from such an error and would willingly pay back pay.

12

Patrolmen, City Exhibit, Paragraph 3). Furthermore, Officer Zarrelli states that he retrieved the Civil Service lists in question from Boston, and presented them to President Thomas Scanlon in June of 2003. (Affidavits of Patrolmen, City Exhibit, Paragraph 5, 6 and 7). Additionally, it was presented at hearing that Patrolman Shawn Kearney, a union member, was the individual who, in part, prepared the Civil Service lists during his employment at the Police Academy. (Testimony of Captain Cochrane). Captain Cochrane also testified that many other union members worked at the academy and assisted in the compilation of documents in controversy.

*******

It is the position of the City of Springfield that the grievance filed by the union is remarkably untimely and that the right to prosecute the grievance has been waived. The practice that the Union now wishes to grieve has been in place without formal complaint, since sometime prior to 1994. The grievance in the present case was filed in February of 2004. Almost ten years after the language change in dispute. The union is essentially asking the City to go back in time nine years and radically restructure the seniority list of the Department. This is an unfair and inequitable request to place upon the employer given the union's culpability in this matter. In this case, the Arbitrator, similar to that of a Superior Court Judge, has broad equitable powers to fashion a remedy that is fair and just. The City would argue that a radical restructuring of seniority would not be a fair and just result. A sweeping retroactive change in the computation of seniority rights would punish the City by creating administrative chaos, and unfairly exposing the Department to significant financial liability. Conversely, the union would be rewarded for its significant temporal negligence. The City did not act with malicious intent or malfeasance; to the contrary, it believed it was acting in compliance with a federal consent decree ordering racial balance. This apparent benevolent gaffe should not result in a mountain of liability for the employer. Furthermore, it is informative to point out that for every union member aggrieved by the City's seniority computations, another union member will be adversely impacted. As such, it is fair to maintain the status quo for all officers appointed between 1995 and 2004.

The Union is sure to argue it had no knowledge of the alleged contractual violation. This argument is either misleading or irrelevant. It is the position of the City that the Union either had actual knowledge of the manner in which the roster was compiled or failed in its duty to ensure that the seniority provision in the contract was implemented.

First, Union members created the lists in question at the Police Academy under the supervision of Captain Cochrane. Second, rosters reflecting the City's method of seniority calculation were disseminated to the union on an almost

13

annual basis. Third, Officer Zarrelli, suspecting a problem with the list, brought it to the attention of union President McDonald in December of 2002. Fourth, Officer Zarrelli retrieved relevant documentation from Civil Service and gave it to President Scanlon in June of 2003. Fifth, in his letter of August 10, 2003 Attorney Coyle acknowledges that union members had "raised questions" regarding the method in which seniority is calculated. Lastly, once the union received the requested Civil Service documents from the City on December 2, 2003 it had ample time to confirm its previous suspicions and file a timely grievance. Clearly, these events demonstrate that the union had actual knowledge of a grievable event.

Furthermore, it is instructive to note that the Union pressed for the language change in the contract. The union must bear some responsibility, as a partner to the contract, to ensure that the provision it had aggressively bargained for was actually implemented. Surely the Union cannot sleep on its rights for eight years and then demand immediate and chaotic implementation. Despite all this evidence, a grievance was not filed until February 24, 2004. By any measure the grievance is between ten years to eleven weeks late. As such, it is untimely and is this dispute is not arbitrable.

### CONCLUSION

Based on the foregoing the City would request that the Arbitrator find for the Employer.

(City Brief, p. 4, 7-9)

### DISCUSSION

At the outset of this discussion, I would like to thank the representatives of the parties for the detailed and professional manner in which they presented their respective positions.

The most fundamental principle in arbitration is that contracting parties are entitled to the fruits of their negotiation. Arbitrators do not have any authority over contracting parties beyond that which they grant to the arbitrator in their Collective Bargaining Agreement. These parties have been specific and clear as to my authority, and limitations on that authority. In Article V, "Grievance Procedure," these parties have stated in pertinent part:

> 5.03 The decision and award of the arbitrator shall be in writing and shall state his/her findings of fact, reasoning and conclusion. The award shall be final and binding upon the City and the Union, provided, however, that the

14

<u>arbitrator shall be without the power to alter, amend, add to or subtract from the provisions of this Agreement.</u> Nothing contained herein shall be construed to forbid either party from resorting to court for relief from, or to enforce rights under any arbitration award.

(Joint Exhibit 1—emphasis added)

The language of Section 5.03 is clear. It forbids me from ignoring the provisions of Section 7.02 and the applicability of that Section to the assignment of badge numbers and seniority. If, as the City asks, I were to consider that provision to be "waived" for the duration of this Collective Bargaining Agreement, I would in effect be "subtract(ing Section 7.02) from the provisions of this Agreement."

As has been noted above, both in the "Dispute" section of this document as well as under the "Positions of the Parties," both sides are in agreement that Section 7.02, as written, 1) has been in the contract since 1995, and 2) has not been followed. The City rightfully points out that nine years is a long time for a contract provision not to be followed without any challenge or grievance being filed by the Union. The City asks that I view that nine-year period of inaction by the Union as constituting a "waiver" of the Union's right to seek enforcement. In raising this topic, the City correctly summarizes the findings of most arbitrators that any such "waiver" would run solely to the question of whether the Union would be entitled to remedy for past failures to implement the language as written. Since arbitrators cannot ignore clear contract language, and most contracts—as does this one—prevent an arbitrator taking actions which would negate or subtract a provision, arbitrators generally rule in favor of future enforceability while limiting remedy for any past failure to grieve.

I cannot agree with the City that the entire responsibility for the way that seniority has been assigned over the last nine years must be laid at the feet of the Union. City and Department administration is every bit as responsible for following the Collective Bargaining Agreement as are Union officials for policing it to ensure it is being followed. The evidence before me does not warrant a conclusion that either Capt. (then Lieutenant) Cochrane nor Police Officer W. Shawn Kearney knew they were not following Section 7.02 when they put together the Form 14 and badge number lists for the three classes at issue in this case. The Affidavit of Officer Kearney, submitted by the Union, states concerning his duties at the Academy that "...I was not an official of Local 364 at the time, and had not participated in the negotiation of §7.02." His affidavit goes on to state, "I was not aware or mindful of the contract provision which addressed badge number assignment, and it never occurred to me that the badge number sequence may have been in conflict with the provisions of the contract." (Affidavit of Officer W. Shawn Kearney) The negotiating

15

notes from the 1995 negotiations leading to Section 7.02 list the attendees, and Officer W. Shawn Kearney is <u>not</u> listed thereon. (Union Exhibits 5 and 6) The statements made by Officer Kearney in his affidavit echo the testimony of then-Lieutenant Cochrane that neither of them put together those badge number lists knowing that they represented a violation of the language of Section 7.02. I am satisfied that the record before me does not warrant a conclusion that Union members of the Academy staff for those three classes knew, or even should have known, of the provisions newly negotiated in 1995 concerning how badge numbers/seniority were to be assigned.

After the arbitration hearing, by agreement, the City supplied five affidavits from five Police Officers indicating that in a meeting on February 25, 2004, Officer Zarrelli "...stated to all members in attendance that during December 2002, he (Thomas Zarrelli) notified then-union president, Edward McDonald, that the seniority as listed on the annual roster was incorrect." The affidavits go on to assert that "...Thomas Zarrelli quoted then-president McDonald as stating he was not concerned about the issue because his tenure as president was ending and that Zarrelli should speak to president-elect Thomas Scanlon, in the presence of Richard Trombley." By means of these affidavits, the City seeks to assert that the Union, through its then-President McDonald, was aware of the fact that Section 7.02 was not being followed. I have several problems with accepting that conclusion based upon these affidavits. First, the affidavits from the five Officers quote Officer Zarrelli as to what Officer Zarrelli recalls then-President McDonald saying approximately 14 months earlier. In addition, when Officer Zarrelli spoke to Local President Scanlon sometime after June 1, 2003, Officer Zarrelli went to the Civil Service and secured various documents. If Officer Zarrelli, in December 2002, knew the exact nature of the grievance eventually filed in this case, it seems reasonable to conclude that in June 2003 he would not have had to engage in any investigation, but would have been readily prepared to inform newly elected President Scanlon of the nature of the alleged violation. That is not what he did. Rather, he engaged in an investigation to secure documents and to develop his theory. His actions in the summer of 2003, in my opinion, contradict the City's attempt to attribute full knowledge to him of the nature of this case as of December 2002, and to attribute full knowledge to Union President McDonald.

I do not accept the City's claim that this Union, through any of its elected officials, ever gained actionable knowledge of the fact that Section 7.02 had not been followed until June 2003 at the earliest. I am satisfied that the Union's investigation between June and December 2003, including its futile attempts to secure a response from the Board of Police Commissioners, represented a good-faith attempt to ascertain the full nature and scope of this problem. The conversations/meetings involving Union officials and City Attorney Murphy

represent a good-faith effort to both fully understand the scope of the problem and to determine, without committing to do so, the consequences of resolving it.

In conclusion, then, on the question of waiver, I am satisfied that the nine-year failure of the City/Department to follow Section 7.02, and the Union failure over those nine years to police its own Agreement, warrant a finding in this case that balances the consequences to each party. I will address this subject again immediately after the following paragraph, which will deal with the City's "past practice" allegations.

In order for a past practice to be binding upon the parties in the future, it must first arise out of vague and/or ambiguous language. Clear contract language must always be given its clear meaning. When language is vague and/or ambiguous, arbitrators may examine past practice in an attempt to ascertain the contracting intent of the parties. For a past practice to be binding, it must be of long standing, fully known to both parties, and finally, agreed to by both parties. There is no evidence before me which would indicate that both of these parties fully understood for nine years that Section 7.02 was not being followed. There is no evidence that for nine years both parties fully agreed to continue to ignore Section 7.02. Further, Section 7.02 is neither vague nor ambiguous. Thus, there is no binding "past practice" in this case.

Given the above, I find that the answer to Issue #1 is that this case is arbitrable. While I have not accepted the City's "waiver" argument as it applies to future enforcement, I am convinced that equity requires a reasonable share of the consequences for this nine-year lapse be borne by each party. The appropriate way to allocate those consequences is by 1) establishing a date as the benchmark for any remedy, and 2) formulating a remedy that adheres to the principle that contracting parties are entitled to the fruits of their negotiation, and that parties may not receive a windfall as a result of their own inaction.

I am satisfied that the February 24, 2004 grievance is a valid grievance. It is arbitrable. I am also satisfied that February 24, 2004 is the appropriate date to establish as the boundary line for remedy purposes. In furtherance of my finding that both parties must bear the consequences of their shared inaction over nine years, I hereby find that the City violated the Collective Bargaining Agreement effective February 24, 2004, the date a grievance was filed. Clearly, the City has been in violation of the provisions of Section 7.02 since the first assignment of badge numbers under its provisions in 1996. However, this violation must be viewed as a "continuing violation," and hence the first date that I will take recognition of the violation for remedy purposes is the date the grievance was filed: February 24, 2004.

17

My decision above is based upon the language of this Collective Bargaining Agreement. Neither party has made an assertion that implementation of Section 7.02 as written would be at odds with the goal of the Consent Decree in *Castro v. Beecher*. Given the numerous references to *Castro v. Beecher* throughout the arbitration hearing, I consider it useful to examine the consequences of this decision on the two categories of Police Officers addressed in that Consent Decree, i.e., minorities and majorities. I acknowledge full well that the reassignment of badge numbers will predominantly advantage majority members of the Academy Classes of 1996 and 1997 in the future with respect to shift and vacation assignments. On the other hand, I note that the same reassignment of badge numbers will predominantly advantage minority Officers on layoff as to their likelihood of being recalled to work. Since the goal of *Castro v. Beecher* was the employment of minority officers as opposed to their vacation or shift selection priority, I am satisfied that this decision does not do trauma to that goal.

## AWARD

1) That this case is arbitrable.

2) That the City did violate Section 7.02 of the Collective Bargaining Agreement by the manner it assigned badge numbers after July 1, 1995. For reasons given in the body of this Award, February 24, 2004 will be utilized as the boundary date for remedy purposes.

## REMEDY

1) The City will reassign badge numbers effective February 24, 2004.

2) The parties will reassess any recalls occurring after February 23, 2004 in light of these newly assigned badge numbers. Any individual, with the newly assigned badge numbers pursuant to Section 7.02, who would have been recalled earlier than he/she was recalled after February 23, 2004, will be made whole for that delay in recall, less any and all outside earnings and/or unemployment compensation associated with that same period.

3) Any individual who was laid off in 2003 and, based upon the reassigned badge numbers in accordance with Section 7.02, would not have been laid off in 2003, will, if not already recalled, be immediately recalled and made whole for all losses back to the date of

18

layoff, less any and all outside earnings and/or unemployment compensation.

4) Any layoff in 2003 where the Officer was recalled prior to February 24, 2004, will not receive any remedy, even though he/she might have had a shorter layoff period under the newly reassigned badge numbers. The absence of any remedy for this group of individuals is in deference to the City's right to be protected against an excessive remedy impact when the Union failed to act on its rights for nine years.

5) Current vacation cycle assignments will not be disturbed, and newly assigned badge numbers based upon this Award will be utilized in the next vacation selection cycle.

6) Current shift assignments will not be disturbed, and newly assigned badge numbers based upon this Award will be utilized for the next round of shift assignments. The City may not avoid the consequences of this Award on shift assignments by unduly delaying the next round of shift assignments.

7) I will retain jurisdiction in this case over any questions concerning implementation of this Award.

*[signature]*

Richard G. Higgins
Arbitrator

DATED: June 25, 2004

# EXHIBIT 2

## *A Certification Handbook*

Entry Level
Police Officer Appointments
Subject to Civil Service
(Castro v. Beecher)

Civil Service Unit
Human Resources Division
One Ashburton Place
Boston, Massachusetts 02108

## CERTIFICATION INSTRUCTIONS

## CASTRO v. BEECHER CONSENT DECREE COMMUNITIES

## POLICE OFFICER

The information contained in this booklet applies specifically to municipalities in which entry level Police Officer appointments are subject to the provisions of the Castro v. Beecher Federal Consent Decree as well as to the requirements of Civil Service law and rule. Police Service Appointing Authorities are advised to review this information carefully prior to making any appointments to the position of Police Officer.

Please remember that this certification instruction packet is intended as a general guide and cannot provide complete detail on all aspects of the selection process. Appointing Authorities and Police Chiefs are encouraged to review the provisions of MGL Chapter 31, the Personnel Administration Rules and other applicable statutes and policies to insure compliance and to prevent delays or problems in appointment approval. Appointments which do not comply with the provisions of applicable law, rule and consent decrees cannot be approved by the Human Resources Division.

**Local officials are advised to retain and refer to this material until an updated version is issued.**