# In The United States District Court
# For The Western District of Massachusetts

**CIVIL ACTION NO.: 04-CV-30163-MAP**

Julio Toledo Jr.,et. al

**PLAINTIFFS**

v.

IBPO, Local 364,

**DEFENDANT**

v.

Springfield Police Department,

**DEFENDANT**

## PLAINTIFFS' SUPPLEMENTAL MEMORANDUM
## IN SUPPORT OF INJUNCTIVE RELIEF

**TO THE HONORABLE PRESIDING JUDGE:**

1. Plaintiffs submit their First Amended Memorandum of Law in support of their Petition for Preliminary and Permanent Injunction in which Plaintiffs respectfully request this Court to enjoin the Defendant City of Springfield Police Department, their agents, servants and employees and those acting in active concert and with actual notice there of, from enforcing the Arbitrator's Award, granted on June 25, 2004, which, is in direct conflict with the Consent Decree enumerated in *Castro v. Beecher*, 334 F. Supp. 930 (D. Mass. 1971), *aff'd*, 459 F.2d 725 (1st Cir. 1972); *Boston Chapter NAACP v. Beecher*, 371 F. Supp.507 (D. Mass.1974), *aff'd*, 504 F.2d 1017 (1st Cir. 1974).

2. Due to the impending deadlines of the Arbitration Award, prompt resolution is necessary in order to protect Plaintiffs' constitutional rights. Plaintiffs also submit this Memorandum to

clarify the exact nature of their substantive constitutional challenges and to demonstrate

Plaintiffs' standing to bring these challenges at this time.

3.  Plaintiffs pray for Declaratory Judgment to determine the constitutionality of the actions of

the Arbitrators Award in exercising jurisdiction over the *Castro v. Beecher* case and in

reassigning badge numbers.

4.  An actual controversy exists between the parties involving substantial constitutional issues,

in that the actions of the Arbitrator in exercising jurisdiction over the *Castro v. Beecher*

case and in reassigning badge numbers constitute actions delegated to this Court, thereby

violating the Federal Consent Decree.

## JURISDICTION AND VENUE

5.  This Court has Federal Question Jurisdiction over Plaintiff's claim to vacate the

Arbitrator's Award because the award was rendered in manifest disregard of federal law.

When the petitioner complains principally and in good faith that the arbitration award was

rendered in manifest disregard of federal law, a substantial federal question is presented

and the federal courts have jurisdiction to entertain the petition. *Greenberg v. Bear,*

*Stearns & Co.*, 220 F. 3d 22, 27 (2nd Cir 200), cert denied, 531 U.S. 1075 (2001).

6.  It is well established that this Court is not prohibited from entertaining a claim that a union

has (1) breached its duty of fair representation or (2) violated the LMRDA. *Vaca v. Sipes*,

386 U.S. 171 (1967); *International Brotherhood of Boilermakers v. Hardeman*, 401 U.S.

233(1971).

7.  Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§2201

and 2202 implemented through Rule 57 of the Federal Rules of Civil Procedure.

8.  One or more Defendants reside in this District, and a substantial part of the events or

omissions giving rise to these claims occurred in this District.  Venue is therefore proper in

the United States District Court for the Western District of Massachusetts pursuant to 28

U.S.C. *1391(b).

## PARTIES

9.  Plaintiffs are and were at all times relevant herein, individuals and residents of Hampden

County Massachusetts and are police officers of the Springfield Police Department.

10. Plaintiffs are minority Springfield Police Officers. (See Affidavits)

11. Defendant IBPO, Local 364, is and was all times relevant herein, a resident of Hampden

County Massachusetts and is the recipient of the Arbitrator's Award granted on June 25,

2004.

12. Defendant City of Springfield Police Department is and was all times relevant herein, a

resident of Hampden County Massachusetts and is the entity responsible for enforcing the

Arbitrator's Award granted on June 25, 2004.

## INTRODUCTION

13. This case is about the Defendant flipping the civil service ranking in contrast with *Castro

v. Beecher*. Realistically, the Court's intent in *Castro v. Beecher* was to create a tool that

would reach the desired objective to remedy past discrimination.  Historically, African

Americans and Hispanics have been denied access for years to the Springfield Police

Department. *Castro v. Beecher* was not intended to be around in perpetuity. How long

does the Court want to continue this?  If the court does not enjoin Defendant City of

Springfield Police Department from enforcing the Arbitrator's Award, the City of

Springfield will continue to be under the mandate of *Castro v. Beecher* consent decree for

another 31 years in order to integrate racial balance within the police department. The

Court's intent was to remedy and reverse the problem of racial disparity within the police

department. If this consent decree has been around for three decades, there is a problem with the application of the hiring procedures.

14. Whether people like it or not, *Castro v. Beecher* is a contractual agreement based on the need of recognizing and correcting a historical problem with lack of access to the police department by minorities. This contract must be adhered to until the problem of racial disparity within the police department is resolved. While **a** consent decree is a judicial pronouncement, it is principally an agreement between the parties and as such should be construed like a contract. See, e.g., *Securities and Exchange Commission v. Levine*, 881 F.2d 1165, 1178 (2d Cir. 1989). Traditional contract principles apply, including the principle that documents incorporated by reference, such as the hiring order at issue here, become an intrinsic part of the contract. Id. at 1179. Furthermore, like a contract, the scope of a consent decree "must be discerned within its four corners," *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971), and, hence, a court construing such a document is "not entitled to expand or contract the agreement of the parties as set forth in the consent decree." *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985).There is something very wrong with people loosing seniority as a result of flipping badge numbers for the sake of majorities.

15. The spirit (intent) of Castro v. Beecher was to facilitate an expeditious infusion of more minorities within the police department. If police department were to suddenly loose minorities by stripping them of their seniority and then lay them off, the system has failed. Due to the current fiscal crisis that the City of Springfield is currently experiencing, the threat of more layoffs within the police department is imminent.

16. This issue of badge changes is a human resource matter. Human resource matters encompass seniority, grievance, appointments and promotions. Seniority is obtained when a police officer first comes on the job. A police officer cannot obtain rank without seniority and she cannot obtain seniority without rank. The two go hand and hand. Why would the

4

Defendant IBPO, Local 364 represent a white officer in arbitration in order to strip minority officers in the class of 1996 and 1997 of their ranking? Is it not true that hiring and ranking are inextricably connected? Is the Defendant IBPO, Local 364 suggesting that the system that currently exists in the Castro v. Beecher has been wrong for the past 31 years?

17. *Castro v. Beecher* is not just about hiring minority police officers, it is about remedying exclusions from Hispanics and African-American's from the Springfield police force. The Plaintiffs received their rank when they were hired under the umbrella of *Castro v. Beecher. The consent decree* goes hand in hand with the seniority system because seniority is last hired and first fired. The Defendant proposes to strip Plaintiffs of eight years of seniority. We really can't extract rank without seniority. They are inextricably connected. *Castro v. Beecher* is inextricable connected to seniority.

18. The Court when it implemented the consent decree intended to remedy a wrong, thus the primary tool it used was to implement hiring procedures. Seniority, although not mentioned in the case, is a collateral benefit of hiring along with promotions and vacation time. The legislation is in place to increase the equity of appointment of minority police officers by "one for one" and not to side step the process.

## PRAYER FOR RELIEF

19. Due to an Arbitration Award, the City of Springfield Police Department will begin reassigning badge numbers in November 2004 to Springfield police officers hired in 1996, 1997, and 1998.

20. Due to the serious constitutional violations alleged by the Plaintiffs in their Complaint, it is imperative that a preliminary injunction, be issued to preserve the status quo until a quick and final determination of the validity of the badge reassignments can be made by this Court.

21. Unless Defendant City of Springfield Police Department is immediately enjoined, it will begin reassigning badge numbers in direct conflict with this Courts 1973, Consent Decree enumerated in *Castro v. Beecher*, 365 F.Supp. 655 (D. Mass. 1973), and the City of Springfield will undermine the effect this Court intended when deciding *Castro v. Beecher*.

22. That this Court vacate the Arbitrator's Award. In labor arbitration cases, the United States Supreme Court has said that a court can overturn an arbitration award on the basis of public policy only if the award clearly violates a clear and dominant public policy that has been articulated in statutes, regulations, or court decisions. *United Paperworkers International Union v. Misco*, 484 U.S. 29 (1987); *Eastern Associated Coal Corp v. United Mine Workers of America*, 531 U.S. 57 (2000). Courts should apply the same analysis in employment arbitration cases.

23. Section 10(a)(4) of the FAA, which permits an award to be vacated due to the arbitrators exceeding their authority, is designed to enable the district court to vacate an arbitral award that clearly goes beyond the substantive issues submitted by the parties. *See Mantle*, 956 F.Supp. at 733; *see also Sheet Metal Workers Int'l Ass'n Local 420 v. Kinney Air Conditioning Co.*, 756 F.2d 742, 744 (9th Cir. 1985).

## I.. **PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF**

24. A party seeking a preliminary injunction must establish these four well known factors: (1) a substantial likelihood of success on the merits; (2) a threat of irreparable injury; (3) that its own injury would outweigh the injury to the nonmovant; and (4) that the injunction would not disserve the public interest. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996); *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir. 1991). Each of these elements is easily met here.

## A.    Plaintiffs' has a substantial likelihood of success on the merits.

25. Plaintiffs strongly believe that there is a substantial likelihood that they will prevail on the merits for the following reasons.   Plaintiffs; assert that Defendant IBPO, Local 364 owed them a duty of fair representation and that it breached that duty in representing one white officer in an arbitration that impermissibly and unlawfully disregarded *Castro v. Beecher* consent decree. A Breach of the duty of fair representation occurs if a union's actions toward an employee are "arbitrary, discriminatory, or in bad faith." *Vaca* v. *Sipes*, 386 U.S. 171, 190 (1967)

26. Plaintiff's allege that the Defendant IBPO, Local 364 breached its statutory duty of fair representation when it discriminated in bad faith by representing a white officer in arbitration that stripped Plaintiffs of their seniority. Plaintiffs who are minority police officers are members of IBPO, Local 364 and are being stripped of their seniority via a grievance brought forth by the Union on behalf of a non minority union members.

27. The Second Circuit held that the defendant union had breached its duty of fair representation to the plaintiffs by negotiating a collective bargaining agreement that gave seniority to those members of the craft who were also members of the union and withheld seniority from otherwise identical members of the craft who were not members of the union. *Jones v. Trans World Airlines, Inc.*, 495 F.2d 790 (2d Cir. 1974). If the Court held that unions'owe a duty of fair representation to nonunion members, how much more of a duty do they have to their very own members.

28. Defendant IBPO, Local 364 argues the Arbitration Award and change of badge numbers "does not have anything to do with *Castro v. Beecher* consent decree". Additionally, Defendant IBPO, Local 364 argues that *Castro v. Beecher* does not have an effect on minority police officer's seniority.

29. Defendant City of Springfield agrees with Defendant IBPO, Local 364 in that that it has been assigning badge numbers incorrectly for the past eight years, nonetheless, their argument is that badge changes should not take place.

30. Plaintiffs' understand that the *Castro v. Beecher* federal consent decree is for the purposes of hiring, and makes no reference to seniority, *however*, in this case the consent decree does have an impact on seniority, thus linking the two.

31. The Consent Decree incorporates a set of remedial measures designed to prevent future discrimination against minority candidates, specifically black and Hispanic applicants for entry level public safety position, including but not limited to assuring that minority candidates will henceforth be given equal opportunity with non-minority candidates for appointment to entry level positions. As such, one of the remedial measures provided by the Consent Decree is certification ratios. Under this corrective plan, the Human Resource Division is obligated to deliver a list of eligible candidates for appointment arranged in a particular order.

32. Redistribution of badge numbers for the purpose of seniority by the appointing authority, the city of Springfield Police Department, violates the certified list established for Public Safety candidates generated by HRD Civil Service Unit in compliance with the ratios set forth by the stipulated court order of Castro v. Beecher (Police) Federal Consent Decree.

33. The Departments has not yet met the minority employment percentage goals (parity) set forth in the Consent Decrees.

34. The appointing authority (City of Springfield Police Department) must petition the State's Chief Human Resources Officer to be exempt from the stipulated court order outlining the hire of entry level Police Officers. An arbitrator has no jurisdiction.

35. The ruling this year by the United States Court of Appeals, First Circuit, in the matter of Quinn v. City of Boston and the NAACP has made it clear that a municipality should petition to be exempt from the Consent Decree once the Department has achieved parity.

The population of the Springfield Police Department is approximately 29% minority to 71% majority.

36. The implementation of the consent decrees takes place when the Human Resource Division (HRD) creates the eligible list of applicants for entry level public safety positions - police. This process begins when an applicant registers to take the police examination and continues with the following process.

37. HRD delivers to the appointing authority a list of eligible candidates for appointment arranged in the following priorities:

   a.   Candidates who have been placed on the top of the eligible list by a decision of the Civil Service Commission or statutory preferential ruling, (i.e. cadets)
   b.   Police officers who have been laid off in other Civil Service Communities in order of original date of hire
   c.   The sons or daughters of Police Officers or Firefighters who died in the line of duty in order of examination score
   d.   Resident Veterans in order of examination score
   e.   Resident non-veterans in order of examination score
   f.   Non-resident Veterans in order of examination score
   g.   Non-resident non-veterans in order of examination score

38. For the municipalities subject to the provisions of the Consent Decree, a list of names of minority applicants, ordered in the same manner as mentioned above are certified according to the stipulated court order. These two lists are then merged together. The merging of the lists is achieved by alternating the name of the highest ranking minority officer and the highest ranking non-minority officer with the minority officer's name placed first on the list followed by the name of the non-minority officer and continuing until twice the number of names plus one is reached to fulfill the requisition of the appointing authority to fill its vacancies. Once this list is generated, it is then forwarded to the Appointing Authority.

39. What exactly does the consent decree provide? The consent decree provides recruitment, examination and certification ration.

i.    **THE CLEAR RELATIONSHIP BETWEEN**

**CASTRO V. BEECHER AND SENORITY**

40. In accordance with *Castro v. Beecher*, 334 F. Supp. 930 (D. Mass. 1971), *aff'd*, 459 F.2d
    725 (1st Cir. 1972); *Boston Chapter NAACP v. Beecher*, 371 F. Supp.507 (D. Mass.1974),
    *aff'd.*, 504 F.2d 1017 (1st Cir. 1974), the city of Springfield must give special preference to
    racial minorities who apply to become police officers.

41. The Human Resources Division (HDR) in Boston holds examinations for those applying
    for police officer positions. Those applicants with scores of seventy or above have their
    names put on an eligible list.

42. When an appointing authority (in this case the Springfield Police Department) has a
    vacancy to be filled, the department files a requisition with the Personnel Administrator.

43. In accordance with *Castro v. Beecher*, HRD will take names from two lists, minority and
    non-minority, in alternation to make up one certification list  *(See Exhibit A)*

44. The Personnel Administrator will then send a certified list of names to the Springfield
    Police Department. *(see Exhibit A)*

45. After the certification list is issued to the appointing authority in accordance with *Castro v.
    Beecher*, all the applicants whose names are on that list are notified by postcard to report
    and sign the certification list to indicate their continued interest in employment.

46. If an individual does not sign the certification list, he or she will be eliminated from the
    hiring process.

47. Once an individual signs the certification list, he or she will remain as a candidate and
    continue with the hiring process.

48. The appointing authority must make a selection from among those who signed and passed
    background investigations and interviews.

49. Candidates will be disqualified for various reasons, failing drug tests, background checks, psychological exam, etc.

50. As candidates are disqualified due to reasons stated above, the remaining selected candidates on the list could potentially list two or three candidates consecutively who are of the same ethnicity. (see Exhibit B)

51. Once the Springfield Police Department has indicated whether individuals have been selected from the certification list, it will create a new list in conformance with *Castro v. Beecher* indicating persons appointed to the Springfield Police Department (see exhibit C) The City of Springfield is instructed to do this at the bottom of the list referred to as Exhibit B. All three lists will then be sent to HRD.

52. Due to previous practice of discrimination against African-Americans and persons with Hispanic sir names, the Springfield Police Department must hire candidates who are African American and persons with Hispanic sir names ahead of other candidates even if those other candidates' names appear higher on the list than that of the selected applicant.

53. The Springfield Police Department will then notify candidates that they have been selected into police academy, to serve as a police officer upon graduation.

54. The Springfield Police Department uses badge numbers for, amongst other purposes, determining seniority amongst police officers.

55. The Springfield Police Department issues badge numbers to newly appointed police officers in the order by which officers appear on the appointed civil service list in conformance with *Castro v. Beecher*. (see exhibit C).

56. The lower the officers badge number is, the more seniority she has. For instance, an officer with badge #1 will be senior to the officer with badge #10.

57. Seniority is the determining factor in circumstances including, but not limited to, shift preference, vacation time, and most importantly, the possibility of layoffs.

58. Badge numbers are distributed among officers in the order by which they are appointed.

59. The list from which officers are appointed is the final list that is submitted from the City of Springfield, to the Human Resources Division in Boston. (see exhibit3)

60. This final list is formulated in a "one for one" manner in accordance with the intent of the consent decree. Thus rearranging the names on the list is a violation of Castro v. Beecher.

61. This issue of badge changes was brought before the Board of Police Commissioners, who unanimously voted against changing the seniority lists and voted against sending the issue to arbitration.

62. This civil service list (exhibit C) lists officers alternating in a one-for-one manner, in accordance with the *Castro v. Beecher* federal consent decree.

63. The Defendant IBPO, Local 364 argues that the language in the contract between the City of Springfield and the Police Department Union, local 364, refers to exhibit B as the list used for determining seniority.

64. The list referred to as exhibit B does not list selected candidates in a one-for-one manner, thus using this list would be in violation of the *Castro v. Beecher* federal consent decree.

65. Clearly this list (exhibit B) does not follow the one-for-one alternating format set out in *Castro v. Beecher*. Because individuals of the same ethnicity/race are listed consecutively. By overriding the Consent Decree, and implementing the list referred to as exhibit B, nearly every minority officer in the class of 1996 and 1997 will be negatively affected. In essence minority officers will lose their seniority, thus allowing majority officers to unfairly increase their seniority. *(See Exhibit F for illustration of paragraphs 32 – 53)*

66. There is a natural anticipation that everyone on the civil service certification list (exhibit B) will not be available to accept a position. There is a natural anticipation that not every minority will be available to accept a position when called upon. This is why on the bottom of the civil service list (exhibit B) states "Except for Pubic Safety certifications issued subject to <u>NAACP</u> or <u>Castro</u> federal consent decrees on which minorities <u>must be moved up in compliance</u> with the provisions of the consent decree."

67. HRD published guidelines entitled "A Certification Handbook" issued to appointing authorities in the State of Massachusetts that are subject to *Castro v. Beecher* consent decree. The handbook clearly instructs all appointing authorities to comply with the provisions of the *Castro v Beecher* Consent Decree. (See Exhibit E, p. 6 ¶ 5.)

68. Prior to this Courts Consent Decree of 1973, the Springfield Police Department had no affirmative practice when hiring minorities and was free to discriminate in its hiring.

69. For the reasons set forth in the accompanying Complaint, Plaintiffs are substantially likely to be able to demonstrate that the reassignment of Springfield Police Officer's badge numbers is in fact a direct violation of *Castro v. Beecher* and does in fact discriminate against minority Officers in the Springfield Police Department.

70. This Court, in *Castro v. Beecher*, 495 F.2d 725 (1st Cir. 1972), set out guidelines for the nondiscriminatory hiring practice of Massachusetts police officers. The Court ordered that to ensure the [b]asic principles of compensatory relief... (4) that certification by the director of Civil Service in response to requisition requests submitted by police departments be made from the two pools of eligibles according to some ratio. Id. at 737. The Court further ordered that to ensure the [b]asic principles of compensatory relief...that certification by the director of Civil Service in response to requisition requests submitted by police departments be made from the two pools of eligibles according to some ratio. Id. at 737. The Court then went on to state that without the cooperation of the appointing authorities in the various police forces the remedial approach could not be fully effective. Id.

71. Plaintiffs intend to show that the Arbitrator's Award, granted on June 25, 2004, is in direct conflict with the Consent Decree enumerated in *Castro v. Beecher*, 459 F.2d 725 (1st Cir. 1972), and that the implementation of the Arbitrators Award by IBPO, Local 364 unfairly and blatantly discriminates against minorities in the Springfield Police Department.

72. The Plaintiffs will show that they are a protected class, that they will suffer harm as a result of the adverse employment action taken by the IBPO, Local 364, and that the determinative cause of the adverse action taken by the IBPO was a direct result of the harbored discriminatory animus the Defendants have for the Plaintiffs in this matter.

73. The basis of the Arbitrator's Award stems from his interpretation of section 7.02 of the Collective Bargaining agreement between IBPO, Local 364 and the City of Springfield. The union contract says that seniority among employees who are hired on the same date and graduate on the same date shall be based in the order of the civil service list from which the applicants are appointed. The tie breaker is the order of the civil service list from which applicants are appointed.

74. Plaintiff's argue that the civil service list from which the applicants are appointed would be the final list. (see exhibit C). Even if this were not true, *Castro v. Beecher* consent decree trumps state contract law. Preemption doctrine is rooted in the Supremacy Clause and grows from the premise that when state law conflicts or interferes with federal law, state law must give way. See, e.g., *CSX Transp., Inc. v. Easterwood*, 113 S. Ct. 1732, 1737 (1993); *Cipollone v. Liggett Group, Inc.*, 112 S. Ct. 2608, 2617 (1992). That provision of the contract reads as follows:

> **7.02** So far as not in conflict with the General Laws, seniority among employees who are appointed and complete recruit training academy on the same date, shall be based in the order of the civil service list from which the applicants are appointed. This paragraph shall apply to the employees appointed after July 1, 1995, and shall not affect the seniority of employees previously appointed whose seniority was computed in accordance with criteria then in effect. If this paragraph is determined to be invalid by a final determination of any court of administrative agency, the parties to this agreement shall commence

14

negotiations on a new criteria for seniority among employees who are

appointed and complete recruit training on the same date. *(Exhibit G)*

75. The Arbitrator interprets section 7.02 of the contract as the leading authority for the hiring

practices carried out by the Springfield Police Department. The Arbitrator briefly mentions

that the "City of Springfield and its Police Department have been subject to the terms of a

Castro v. Beecher consent decree. The Arbitrator goes on to acknowledge that the Consent

Decree requires that the "Springfield Police Department engage in a hiring procedure

resulting in "one for one" hiring of minorities and majorities." (Exhibit D, Arbitration

Award, p. 5). However, the Arbitrator when finding for IBPO, Local 364 clearly usurps

the purpose of the Consent Decree and applies his own somewhat thwarted interpretation to

this Courts Decree.

76. The Arbitrator acknowledges that the reassignment of badge numbers will predominantly

advantage majority members of the Academy Classes of 1996 and 1997 in the future with

respect to shift and vacation assignments, but will also advantage minority officers

currently on layoff because their likelihood of being recalled would increase. (Exhibit D, p.

18).  This is not the effect the Court sought when it decided *Castro v. Beecher*, 365 F.Supp

655 (D. Mass. 1973).  The goal to right the disparity amid the appointment of minority

workers cannot be accomplished by a <u>likelihood</u> that laid off workers will be recalled.  The

application of the Arbitrators award does nothing to ameliorate the continuing effects of

past discrimination. In fact any relief that was afforded to minorities based on "a program

of color conscious relief that included priority pooling of minorities, with choices made

from the priority pool until it was exhausted" will be reversed at the implementation of the

Arbitrators award. See *Castro v. Beecher*, 365 F.Supp 655 (D. Mass. 1973).

77. In essence, the lack of a seniority provision in the consent decree is because the court did

not contemplate that an entity such as Defendant IBPO, Local 364 would go through the

back door and attempt to impermissibly modify *Castro v. Beecher* consent decree..

78. The facts clearly show that the Plaintiffs have a substantial likelihood of prevailing on the merits. In sum, Plaintiffs assert that Defendant IBPO, Local 364 was aware that its decision to represent a white officer in arbitration that would cause injury to minority officers by stripping them of their seniority. Defendant IBPO, Local 364 was also mindful that their actions to represent a white officer in arbitration would cause great hostility within the police department, thereby intentionally causing hostility within the work place.

79. Even if the Court should find that Defendant IBPO, Local 364 did not intentionally discriminate against Plaintiffs, the duty of a union to fairly represent the interests of its bargaining unit employees is inherent in its status as the exclusive bargaining representative. *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 909-10, 17 L.Ed.2d 842 (1967).

80. This Court, when addressing the issue of the duty of fair representation, has stated that arbitrary conduct amounting to a breach is not limited to intentional conduct by union officials but may include acts of omission which, while not calculated to harm union members, "may be so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary." *NLRB v. Local 282, Int'l Bhd. of Teamsters*, 740 F.2d 141, 147 (2d Cir. 1984) (*quoting Robesky v. Qantas Empire Airways, Ltd.*, 573 F.2d 1082, 1090 (9th Cir. 1978)).

81. When the Defendant IBPO, Local 364 chose to represent a white officer in supersede a long standing federal consent decree, it intentionally created great hostility and strife within the department. As a result of the Arbitration Award, tension between white and minority officers escalated within the Springfield Police Department. "[T]he exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *In Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 111 S.Ct. 1127, 113

L.Ed.2d 51 (1991), the Supreme Court stated that "[t]he duty of fair representation is . . . akin to the duty owed by other fiduciaries to their beneficiaries." Id. at 74, 111 S.Ct. at 1133.

### B.    Plaintiffs Will Suffer Irreparable Harm If This Court Does Not Issue An Injunction

82. The Second requirement is that there exists the threat of irreparable injury. It is hard to imagine how the Plaintiffs would not be injured if IBPO, Local 364's manipulation of the Consent Decree, enumerated in *Castro v. Beecher*, is allowed to proceed based on the Arbitrator's award.

83. The reassignment of badge numbers is a direct violation of Title VII of the Constitution and an order from the United States District Court, condoning this type of violation would cause unprecedented damage to Plaintiffs.

84. Minority police officers in Springfield as well as the Commonwealth have fought long and hard to gain ground in achieving equality at this juncture.

85. The Plaintiffs, class of 1996 and 1997, minority police officers will drop to the bottom end of the seniority list, white majority officers will graduate to the top of the list.

86. The Plaintiffs, class of 1996 and 1997, minority police officers whose job was once safe from being laid off, are now in serious and immediate danger of losing their jobs due to the fact that they have lost their seniority.

87. The Plaintiffs, class of 1996 and 1997, minority police officers presently employed and could  be forced to be laid off.

88. As a result of this Arbitration Award, there are also officers who are presently laid off who should have never been laid off to begin in.

89. The Plaintiffs, class of 1996 and 1997, minority police officers will lose their preference in vacation time, and will be forced to remain on undesirable shifts for longer periods of their career.

90. Plaintiffs have spent many years suffering through undesirable shift assignments to achieve the more desirable shifts based on their seniority. The chance of these minority officers ever regaining their current seniority will be permanently lost. In essence once badge number reassignment takes effect and officers lose their seniority they will never be able to be made whole again.

### C.    Movant's Injury Outweighs Injury to Non-Movant

91. The plaintiffs will continue to suffer violations of their constitutional rights, and thus irreparable harm, unless the Arbitration Award is enjoined. A damages remedy would be especially inadequate given the domino effect of the seniority system. *Brennan v. N.Y.C. Bd. of Educ.*,260 F.3d 123, 127 (2nd Cir. 2001)

92. Moreover, the public interest would be served by issuing a preliminary injunction. "It is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge Inc. v. Michigan Liquor Control Commission*, 23 F.3d 1071, 1079 (6th Cir. 1994); *accord O'Donnell Construction Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992

93. On the other hand, a preliminary injunction would impose little hardship on the defendants, who would merely be required to suspend their implementation of the Agreement and return to the *status quo* pending trial. Both minority and majority officers retain their status quo on the force and do not waiver in their seniority.

94. The movant's injury would obviously outweigh the injury to the non-movant if a preliminary injunction is not granted. If the IBPO, Local 364 is permitted to implement the

18

Arbitrator's award the Plaintiffs' injury is final and fatal. Plaintiffs' eight years of seniority would be lost forever.

95. Defendants would not be injured due to the fact that its contract would not be negatively impacted, but could in fact remain as it is and continue to defer to the Consent Decree for direction to the appointing authority and its part in carrying out the Consent Decree.

### D.    The Public's Interest Will Not Be Disserved

96. Finally, the issue of a preliminary injunction will not disserve the public interest. The exact opposite will occur. If the injunction is not issued, and the implementation of the Arbitrators award goes forward, and minority police officers are discriminated against the public interest and faith will be destroyed.

97. The public interest in seeing the hiring of minority officers remain on a one-to-one basis is great. It is in the interest of the public to see the continued reparation of past discriminatory hiring practice in the Springfield Police Department.

98. By allowing the Arbitrator's Award to IBPO, Local 364 to take effect would negatively affect the minority officers on the Springfield Police Department. Due to Springfield's Fiscal Difficulties, the Arbitrator's Award will cause a multitude of minority officers to be among the first to be laid off.

99. The Court in *Boston Firefighters Union Local 718 v. Boston Chapter NAACP, Inc.*, 468 U.S. 1206 (1984) enjoined the layoffs of minority police officers, and the court concluded that seniority-based layoffs would impede its efforts to remedy the past discrimination. Accordingly, the District Court enjoined the Police and Fire Departments from conducting layoffs in a manner that would reduce the percentage of minorities employed in those Departments. *Castro v. Beecher*, 522 F.Supp. 873 (Mass.1981). As a consequence, some nonminority employees were laid off ahead of minorities with less seniority. The State Civil Service Commission and the unions representing affected nonminority persons

challenged the orders of the District Court. The Court of Appeals, however, affirmed. *Boston Chapter, NAACP v. Beecher*, 679 F.2d 965 (CA1 1982).

100.     This Court has the authority t vacate the Arbitrator's award when it violates public policy. When an arbitrator exceeds his contractual authority, vacating or modifying the award is an appropriate remedy. *American Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405-06 (5th Cir. 2003); *Delta Queen Steamboat Co. v. District 2 Marine Eng'r Beneficial Ass'n, AFL-CIO*, 889 F.2d 599, 602 (5th Cir. 1989); *Container Prods., Inc. v. United Steel Workers of Am.*, 873 F.2d 818, 820 (5th Cir. 1989). The Fifth Circuit in *American Eagle* upheld the district court's decision to vacate an arbitration award because the arbitrators acted beyond their authority in crafting a remedy not provided by the agreement of the parties. 343 F.3d at 410-11.

101.     The Fifth Circuit, following the Supreme Court's lead, recognized some circumstances in which a court may refuse to enforce an arbitration award that is contrary to public policy. *Prestige Ford v. Ford Dealer Computer Services, Inc.*, 324 F.3d 391, 396 (5th Cir. 2003); *see also Gulf Coast Indus. Workers Union*, 991 F.2d at 248-49. The public policy exception is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy. *Misco Inc.*, 484 U.S. at 32 (citing *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766 (1983)); *Hurd v. Hodge*, 334 U.S. 24, 34-35 (1948). The Supreme Court noted that a court may not enforce a collective-bargaining agreement that is contrary to public policy and that the question of public policy is ultimately one for resolution by the courts. *Misco Inc.*, 484 U.S. at 43 (citing *W.R. Grace*, 461 U.S. at 766.

102.     In addition, public interest would be negatively affected because minority officers would be dissuaded from applying for positions with the Springfield Police Department; thereby depleting the pool of competent individuals willing to serve on the force. As a result, the intent (spirit) of Castro v. Beecher will have been to no avail.

## CONCLUSION

Wherefore, Plaintiff respectfully requests this court to grant the relief requested in its Application for Injunctive and Declaratory Relief.


DATE:  OCTOBER 22, 2004                    Respectfully submitted,

                                           **ATTORNEY FOR PLAINTIFFS**


                                           _____
                                           Tammy Sharif
                                           BBO#: 6591334
                                           Attorney For Plaintiffs
                                           The Walker Building
                                           1242 Main Street, Suite 314
                                           Springfield, MA  01103
                                           Telephone: (413) 439-0200
                                           Facsimile:  (413) 785-0801

## CERTIFICATE OF SERVICE

**The undersigned hereby certifies** that a true copy of the within Supplemental Memorandum for Injunctive Relief was this day served upon all parties to this action by mailing same, first class postage prepaid to all Attorneys of record.

SIGNED under the pains and penalties of perjury.

DATE: OCTOBER 22, 2004                    Respectfully submitted,

**ATTORNEY FOR PLAINTIFFS**

Tammy Sharif
BBO#: 6591334
Attorney For Plaintiffs
The Walker Building
1242 Main Street, Suite 314
Springfield, MA 01103
Telephone: (413) 439-0200
Facsimile: (413) 785-0801

**Copies to be served upon:**

Kevin B. Coyle
Coyle, Dunbar, Geoffrion & Ward
935 Main Street
Springfield, MA 01103

Peter M. Murphy
City of Springfield
Law Department
36 Court Street
Springfield, MA 01103

Edward M. Pikula
City of Springfield
Law Department
36 Court Street
Springfield, MA 01103