# United States District Court
# District of Massachusetts

Kevin Bell, Juan R. Estrada, David Franco,
Tommie O. Hart, Josh C. Haygood, Jason E.
Larrier, Howard Lockwood, Leonard Matos
Jr., Greg McCain, Pedro R. Mendez, Angel
Perez, Herminio Rivas Jr., Martin Santa,
Julio Toledo, Rafael Vega

PLAINTIFFS

v.

IBPO, Local 364  and City of Springfield

DEFENDANTS

CIVIL ACTION NO.
3:04-cv-30163-MAP

## CITY OF SPRINGFIELD'S MEMORANDUM PURSUANT TO AN ORDER FOR FURTHER BRIEFING

**Introduction**

The City of Springfield files this memorandum in response to the plaintiffs'
motion for a preliminary injunction and the court's request for further briefing. Important
procedural history since the first court hearing on this motion must be reviewed to put the
context of the City's response in perspective.

Specifically, the plaintiff's have filed a motion to amend the complaint to add the
City of Springfield (City) as a party defendant.  In the complaint and proposed amended
complaint, there are no specific counts directed towards the City and there are no specific
allegations of wrongdoing directed against the City. But for the fact that the City has been
ordered by an Arbitrator to readjust seniority, there does not appear to be any basis for

- 1 -

44505

adding the City as a party to this case. As such, the City has opposed the motion to amend, on the grounds that it is more appropriately a party in interest rather than a party defendant, and has requested a more definite statement be filed by the plaintiffs setting forth the legal theories and claims and factual support for the basis for adding the City as a party defendant. Under the circumstances, the City does not expect that the plaintiff's can succeed on the merits against the City.

Further, the City contends that it is not in any position to address legal theories directed at the Union. However, in recognition of the fact that the City is affected by any decision this court should reach with regard to the motion for preliminary injunction, the City is in a position to provide procedural and factual history to assist the court in the disposition of the pending motion.

It is the City's position, based on a review of the factual background and consent decree at issue, that the consent decree is not applicable to the seniority issue, which was the subject of the underlying arbitration. Moreover, the procedure to vacate an arbitration award set forth in M.G.L. c. 150C, section 11, has not occurred in this case.

Based on the inapplicability of *Castro-Beecher* to the facts here, and the current procedural status and long delays in raising any objection to the City's seniority procedures, the plaintiffs are not likely to succeed on the merits of their complaint against the City, and therefore unable to meet the requirements for a preliminary injunction. This is explained in greater detail in the following discussion.

44505

## Statement of the Facts

The factual background is taken from the Arbitrator's decision, the attached Affidavit of Captain William Cochrane, and an affidavit from plaintiff Julio Toledo, filed in the Arbitration.

Seniority in the Springfield Police Department determines the order of lay-off, shift assignment, vacation eligibility, and other benefits.

For many years prior to 1994 there was a question as to the manner in which seniority dates, and consequently badge numbers, were assigned. The seniority language in the collective bargaining agreement in 1994, based on actual Civil Service Exam score, was not followed, and apparently had not been followed "for many years."

During negotiations for a contract to begin in 1995 the City of Springfield, and the International Brotherhood of Police Officers Local, 348 (Hereinafter Local 348 or the Union), negotiated changes to the seniority provision of the Collective Bargaining Agreement. The Union made several suggestions as to the potential language, and the City ultimately agreed to a change in Article 7.02 of the contract. (Exhibit 1 to the Cochrane Aff.). This language change was implemented for the Collective Bargaining Agreement which began in June of 1995. The same language was also maintained in the successor agreements to the 1995 contract, which ultimately ran through 2003 and has not been changed in any subsequent contract. In short, the disputed language has been contained in contracts for approximately eight years.

The City of Springfield operates under a federal consent decree, known as the *Castor-Beecher* Decree, which promotes racial balance in the hiring of Police Officers. Under the decree the Department must engage in a process, which promotes "one-for-

- 3 -

44505

one" hiring, meaning one minority selected for every majority candidate. When the City intends to hire, the Civil Service certification list received from the Civil Service Commission and the Commonwealth's Human Resources Division is in a "one-for-one" format when received from Civil Service.

The hiring process after receipt of the Civil Service list, then requires a candidate to appear and sign the list. An orientation is done, and he or she is given an application package with all of the forms necessary to be completed for employment, as well as guidelines for elimination, which sets forth those circumstances that will disqualify them from employment. They are required to fill out the paperwork and return it within a set period of time.

A background check is then performed. If they are not eliminated as a result, they are given an interview in front of the City's Board of Police Commissioners. At that point, the candidate is either offered conditional employment or eliminated or bypassed.

The applicants are notified by letter as to the outcome of the interview. Those offered conditional employment will be scheduled for a medical examination, upon completion, they will take a physical abilities test administered by the state HRD.

After the physical test is successfully completed, a psychological screening is ordered. Passing the psychological screening then leads to qualification for a 24 week police academy. Upon entrance to the academy, the original civil service list was redisbursed.

Hiring is always "1:1", but due to a number of circumstances, the final graduating class might not represent the original "1:1" hiring.

44505

When the list of appointed officers in question would become finalized, the City would re-disburse the list to reflect a racially balanced, "one-for-one" list. In essence the Civil service list was disbursed in a one-for-one fashion twice. Once by the Civil Service Commission, after candidates took and passed the examination, and second by the City of Springfield once officers had officially been hired and were about to enterthe Police Academy and thereby obtain a place on the seniority list. Captain William Cochrane, the supervisor at the police academy during the relevant time period, was under commonly involved in the second re-disbursement.

Since before 1994, the City has used the second list as a method of computing seniority. (Arbitration Testimony of Captain Cochrane). This second list in most instances becomes the roster that was used for seniority purposes. (Please See Exhibit 2, Cochrane Aff., Rosters) Essentially, the Department would use the rank on the Civil Service certification list, then re-disperse the list to reflect a minority/majority breakdown.

The union ultimately grieved the City's method of computing seniority and the matter proceeded to arbitration. The union alleged that this second re-disbursement of the list, done for the purposes of racial balance, was a violation of Article 7.02 of the contract.    This grievance has lead up to the Arbitration decision at issue in this case.

On approximately February 7, 2003 the City of Springfield, due to severe budgetary restraints, was forced to lay-off seventy-five (75) police officers. As one can imagine, this had the trickle down effect of many transfers, to and from, a variety of shifts and bureaus. The Department used the then current roster to determine seniority for purposes of these lay-offs, transfers and assignments. At no time prior to, or

- 5 -

immediately subsequent to the lay-offs did the union suggest that the seniority list used by the City was inaccurate or in violation of the contract.

On several occasions between 1994 and 2003 the City distributed rosters to all patrolmen. These rosters provided notice to the patrolmen as to their seniority in comparison to all other employees in the Union. At no time between 1994 to 2003 did any employee, nor any union representative, file a grievance disputing the method in which the City computed seniority. On August 10, 2003 the union filed a request for documentation, specifically the Civil Service certification from which all officers were appointed since July 1, 1995. There is no dispute that these were public records available, at all relevant times, through the Civil Service Commission in Boston. In its correspondence dated August 10, 2003 the union stated that some members have "raised questions regarding the badge number/seniority of members of Local 364 IBPO." (Arbitration Union Exhibit 1). On December 2, 2003, the City provided the Union with much of the requested documentation. (Arbitration Union Exhibit 4 ). A Grievance on this matter was ultimately filed by the Union on February 24, 2004.

As noted in the Affidavit of Julio Toledo, (Exhibit attached hereto) on February 25, 2004 the Union held a meeting of members at the Springfield Police Department.

At the meeting, union member Thomas Zarrelli indicated to all members in attendance that in December of 2002 he had told former Union President Edward McDonald that the seniority as listed on the annual roster was incorrect. Furthermore, Officer Zarrelli stated that he retrieved the Civil Service lists in question from Boston, and presented them to President Thomas Scanlon in June of 2003.

44505

Additionally, it was presented at the Arbitration hearing that Patrolman Shawn Kearney, a union member, was the individual who, in part, prepared the Civil Service lists during his employment at the Police Academy. (Testimony of Captain Cochrane at Arbitration). Captain Cochrane also testified that many other union members worked at the academy and assisted in the compilation of documents in controversy.

The Arbitrator ruled that the "second re-disbursement" performed under the direction of Captain Cochrane was a violation of the Collective Bargaining Agreement. Pursuant to that Arbitration, the City stands ready to adjust seniority, without reference to a "second re-disbursement." The impact of this readjustment will have a random affect, with some minority officers rising on the seniority list, while others will be lowered.

## Review of *Castro-Beecher* Requirements

The case of *Quinn v. City of Boston*, 325 F.3d 18, (1st Cir. 2003) provides a description the *Casto-Beecher* history:

"In the early 1970s, two suits were brought against a number of municipalities subject to the Massachusetts Civil Service law (now codified at Mass. Gen. Laws ch. 31, §§ 1-77). The suits alleged that the municipalities engaged in discriminatory recruitment and hiring practices whilst staffing their respective fire departments. These actions culminated in the entry of an omnibus consent decree that influenced the manner in which the affected municipalities could recruit and hire firefighters. *Boston Chapter, NAACP, Inc. v. Beecher*, 371 F.Supp. 507, 520-23 (D.Mass.1974) (*Beecher I* ). The decree was affirmed on appeal. *Boston Chapter, NAACP, Inc. v. Beecher*, 504 F.2d 1017, 1028 (1st Cir.1974) (*Beecher II* ), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975). It has been in effect for nearly thirty years."

Under the decree, the civil service eligibility list was assembled according to the procedures specified in the decree. *See Beecher*, 371 F.Supp. at 522-23. Briefly stated, those procedures stipulated that the candidates placed on the list must have passed a properly validated qualifying examination and otherwise have met all eligibility

- 7 -

44505

requirements for the position. Beyond that point, the list was to consist of one minority candidate (i.e., black or Spanish-surnamed) for each white candidate. The decree contemplated the continued use of statutory preferences ceding pride of place to veterans, children of deceased or permanently disabled firefighters, and the like, *see, e.g.,* Mass.Gen. Laws Ann. ch. 31, §§ 26, 40 (1992), even if those persons achieved lower test scores than other qualified white candidates.

As stated in *Mackin v. City of Boston*, 969 F.2d 1273, 1274 (1st Cir. 1992), "the *Beecher* decree was intended to rectify a situation in which many fire departments within Massachusetts had remained lily-white, or nearly so, despite dramatic increases in the African-American and Hispanic populations. The decree sought to accomplish its goal by affirmative action, i.e., by fostering a hiring regime that accorded race-based preferences to blacks and Spanish-surnamed individuals." *Mackin* Id. at 1274.

Each of the affected departments was to remain subject to the strictures of the decree (and, thus, to accord race-based preferences through the adjusted list) until such time as that department met a general benchmark established by the decree: the attainment of parity (or, at least, rough parity). *See Beecher I,* 371 F.Supp. at 523 (providing for release from the decree "[a]s a city or town achieves a complement of minorities commensurate with the percentage of minorities within the community"). The meaning of this criterion, and the manner in which it is to be gauged, are questions that have permeated the *Beecher* litigation from the outset.

Under the consent decree, the personnel administrator for the Commonwealth of Massachusetts Human Resources Division has certified minority and non-minority candidate lists for firefighter and police vacancies. Over time, the Decree has been

- 8 -

supplemented by several consent decrees designed to implement administrative procedures for offering examinations, establishing eligibility lists, releasing municipalities from continuing judicial oversight, and the like. Unlike some 30 or more departments which heretofore met the goals of the Decree and gained release from its constraints, the City of Springfield ("City") remains under its aegis.

An example of the application of the Consent decree can be seen using hypothetical data, which was available prior to the 2003 layoffs in the City Police Department. The formula for computing is to add up the tenured Black and Hispanic officers divided by the total number of uniform positions to get the number of minority officers. The number of minority officers is to be compared with the total number of Black and Hispanic population in Springfield.[1] If the minority officers on the force represent the percentage of minorities in the City, then the City has achieved the Federal Standards.

The City's population can broken down into the following percentages: White: 56.1 %; Black or African American; 21% and Hispanic or Latino; 27.2%.[2] Prior to the 2003 layoffs, there were 508 police officers on the City's police department.

---

[1] Some of this information was gathered during a conversation a former attorney from the Law Department had with Attorney Toni Wolfman, of Foley Hoag LLP who is responsible for overseeing of the consent decree and is the foremost expert on the consent decree.

[2] According to U.S. Census Bureau, Census 2000

44505

The breakdown of the Springfield Police Department was as follows:[3]

|          | Male | Female |
|----------|------|--------|
| White    | 319  | 22     |
| Black    | 62   | 14     |
| Hispanic | 83   | 7      |

and 1 "other".

In order to use this formula, you must add up the number of Black & Hispanic police officers, which was 166 police officers, divided by the total number of police officers, which was 508. This number equals 32.7%. This number is compared to the number of minorities in the City, which was 21% for Blacks and 27.2% for Hispanics/Latinos (together equaling 48.2% of the total population). The percentages that need to be compared are 32.7% (# of minority officers on the Springfield Police Department) compared to 48.2% (Springfield population is either Black or Hispanic).

As previously stated, there is no time limit to fulfill the Decree. The Decree will be fulfilled when the number of minority officers on the police force represents the population number of minorities living in the City.

As a point of information is should be noted that, although, women have the status of a "protected class", they are not covered by the Decree, unless they are also Black or Hispanic. Women are not protected under the Decree. Black women and Hispanic women are included in the coverage by the consent decree, but not White women.

---

[3]This public information is according to Springfield Personnel Department, via Gail Walls, and are accurate as of March 31, 2002.

44505

There are other situations, which result in the actual seniority list not being "1:1". For example, linguistic issues are not included in the Decree. In order for linguistic issues to be addressed, a special list, which is called a "form16", needs to be requested from the Massachusetts Department of Human Resources Division, (hereinafter, referred to as "HRD"). The special list circumvents the Decree to provide for hiring outside of the list. The special list allows the Police Department to extend its minority hiring, for example, to minorities such as Vietnamese or Russian. This request for a "form 16" is frequently used by other communities in Massachusetts such as New Bedford, (where there is a large Cape Verdien population) or in Lynn, (large Vietnamese population).

The Police Cadet program, M.G.L. 147 § 21A, is not included under the Decree nor is it included under Civil Service Law. Furthermore, to clarify the purpose of the Decree, the Decree was not designated as a "seniority" or "promotion" rule, it is a rule that applies to the *pool* of applicants to choose from, and was designated as a tool to promote 1:1 hiring (for e.g. 1 minority hired for each 1 non-minority hired). The decree was designed to provide an accurate list or pool of candidates to choose from when hiring. The list must include one non-minority to one minority candidate.

The consent decree was devised to have a diverse *pool of candidates* not to impose stringent *hiring practices* upon the City Police force.

Under the *Castro-Beecher* Decree there are no restrictions regarding the single reinstatements and single lateral transfers. The consent decree is not to be confused as means for a quota system. The Decree's purpose is to devise a diverse pool of candidates to be hired by the City's Police Department.

- 11 -

## Conclusion

Based on a review of the *Castro-Beecher* Decree provisions, it does not appear that it is applicable to the seniority decisions, which were the subject of the underlying arbitration. For the reasons set forth in this brief, the plaintiffs are not likely to succeed on the merits of their complaint.

BY:

Edward M. Pikula, Esq.
Associate City Solicitor
City of Springfield
36 Court Street
Springfield, MA   01103
(413) 787-6085
BBO#:  377990

Peter M. Murphy, Esq.
Associate City Solicitor
BBO#:

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the within Notice of Appeal was this day served upon Plaintiffs counsel of record by mailing copy of same, first class mail to: Tammy Sharif and Holly Dawn Battige, Law Firm of Tammy Sharif , 1500 Main Street, Suite 270, Tower Square, Springfield, MA 01115 and 1242 Main Street, Ste. 314 Springfield, MA 01103, and Attorney Kevin Coyle, 935 Main Street, Springfield, MA 01103 SIGNED under the pains and penalties of perjury.

Dated:  11 / 5 / 04

44505

# Affidavit of Capt. Cochrane

# United States District Court
# District of Massachusetts

Kevin Bell, Juan R. Estrada, David Franco,
Tommie O. Hart, Josh C. Haygood, Jason E.
Larrier, Howard Lockwood, Leonard Matos
Jr., Greg McCain, Pedro R. Mendez, Angel
Perez, Herminio Rivas Jr., Martin Santa,
Julio Toledo, Rafael Vega

PLAINTIFFS

v.

IBPO, Local 364  and City of Springfield

DEFENDANTS

CIVIL ACTION NO.
3:04-cv-30163-MAP

## AFFIDAVIT OF WILLIAM COCHRANE

I William Cochrane, on oath do say:

1.    I am a Captain employed by the City of Springfield Police Department.

2.    Seniority is important to Springfield Patrolmen, as it may determine the

      order of lay-off, shift assignment, vacation eligibility, and other benefits.

3.    Badge numbers are assigned according to seniority.

4.    The City of Springfield operates under a federal consent decree, known as

      the *Castor-Beecher* Decree, which promotes racial balance in the hiring of

      Police Officers.

5.    The Department must engage in a process, which promotes "one-for-one"

      hiring, meaning one minority candidate selected for every majority

      candidate.  When the City intends to hire, the Civil Service certification

list received from the Civil Service Commission and the Commonwealth's Human Resources Division is in a "one-for-one" format.

6.    I was the supervisor at the police academy during the relevant time period.

7.    When the list of appointed officers in question would become finalized, the City would re-disburse the list to attempt to reflect a racially balanced, "one-for-one" list. In essence the Civil service list was disbursed in a one-for-one fashion twice. Once by the Civil Service Commission, after officers took and passed the examination, and second by the City of Springfield once officers had officially been hired and were about to enter the Police Academy and thereby obtain a place on the seniority list.

8.    Additionally, Patrolman Shawn Kearney, a union member, was the individual who, in part, prepared the Civil Service lists during his employment at the Police Academy. Many other union members worked at the academy and assisted in the compilation of documents in controversy.

9.    I have been told that since before 1994, the City has used the second list as a method of computing seniority.

10.   No Union member ever complained to me about that the contract was violated until approximately February of 2004.

11.   This second list in most instances becomes the roster that was used for seniority purposes. (Please See Exhibit ⌒, Rosters)

12.     Essentially, the Department would use the rank on the Civil Service certification list, then re-burse the list to reflect a minority/majority breakdown.

13.     An outline of the Springfield Police Department Police Officer Appointment Process is attached as an Exhibit to this affidavit.

14.     The hiring process, after receipt of the Civil Service list, then requires a candidate to appear and sign the list. An orientation is done, and he or she is given an application package with all of the forms necessary to be completed for employment, as well as guidelines for elimination, which sets forth those circumstances that will disqualify them from employment. They are required to fill out the paperwork and return it within a set period of time.

15.     A background check is then performed. If they are not eliminated as a result, they are given an interview in front of the City's Board of Police Commissioners. At that point, the candidate is either offered conditional employment or eliminated or bypassed.

16.     The applicants are notified by letter as to the outcome of the interview. Those offered conditional employment will be scheduled for a medical examination, upon completion, they will take a physical abilities test administered by the state HRD.

17.     After the physical test is successfully completed, a psychological screening is ordered. Passing the psychological screening then leads to qualification for a 24 week police academy.

18. Upon entrance to the academy, the original civil service list was redisbursed.

19. Hiring is always "1:1", but due to a number of circumstances, the final graduating class might not represent the original "1:1" hiring.

20. However, there are other situations, which result in the actual seniority list not being "1:1". For example, linguistic issues are not included. In order for linguistic issues to be addressed, a special list, which is called a "form16", needs to be requested from the Massachusetts Department of Human Resources Division, (hereinafter, referred to as "HRD"). The special list circumvents the Decree to provide to hire outside of the list. The special list allows the Police Department to extend its minority hiring, for example, to minorities such as Vietnamese or Russian. I have been informed that this request for a "form 16" is frequently used by other communities in Massachusetts.

21. The union ultimately grieved the City's method of computing seniority and the matter proceeded to arbitration. The union alleged that this second re-disbursement of the list, done for the purposes racial balance, was a violation of Article 7.02 of the contract.

22. On approximately February 7, 2003 the City of Springfield, due to severe budgetary restraints, was forced to lay-off seventy-five (75) police officers. As one can imagine, this had the trickle down effect of many transfers, to and from, a variety of shifts and bureaus. The Department used the current roster to determine seniority for purposes of these lay-

offs, transfers and assignments.  At no time prior to, or immediately subsequent to the lay-offs, was I aware that the union suggested that the seniority list used by the City was inaccurate or in violation of the contract.

23.   I am unaware of any current plans for additional layoffs.

24.   On several occasions between 1994 and 2003 the City distributed rosters to all patrolmen.

25.   These rosters noticed the patrolmen as to their seniority in comparison to all other employees in the Union.  To the best of my knowledge, at no time between 1994 to 2003 did any employee, nor any union representative, file a grievance disputing the method in which the City computed seniority.

26.   I have been informed that on August 10, 2003 the union filed a request for documentation, specifically the Civil Service certification from which all officers were appointed since July 1, 1995.

27.   I believe these were public records available, at all relevant times, through the Civil Service Commission in Boston.

28.   I am informed that in its correspondence dated August 10, 2003 the union stated that some members have "raised questions regarding the badge number/seniority of members of Local 364 IBPO."  (Union Exhibit 1 from Arbitration).

29.   I have been told that on December 2, 2003, the City provided the Union
      with much of the requested documentation. (Union Exhibit 4 from
      Arbitration).

30.   A Grievance on this matter was ultimately filed by the Union on February
      24, 2004.

31.   The Arbitrator ruled that the "second redisbursement" for the City was a
      violation of the Collective Bargaining Agreement. Pursuant to that
      Arbitration, the City stands ready to adjust seniority, without reference to
      a "second redisbursement." The impact of this readjustment will have a
      random affect, with some minority officers rising on the seniority list,
      while others may be lowered.  The same holds true for affectedmajority
      officers, some will rise in seniority and others may be lowered.

Signed under the penalty of perjury this 5th day of November, 2004.


William Cochrane

# Exhibit 1

# Springfield Police Department
# Police Officer Appointment Process

1) The City of Springfield makes the decision to hire police officers.

2) A certified list of potential candidates is requested by the Board of Police Commissioners from the Massachusetts Human Relations Division (HRD) and Civil Service.

3) Two copies of that list are sent to the Springfield Police Department.

4) At the same time, HRD mails out a notification card to all those eligible applicants. The card indicates to them that if they desire to be considered, they must report in person to the Chairman of the Board of Police Commission on or before a specific date indicated.

5) When the candidate reports, he/she is required to sign both copies of the certified list, submit the card and produce a valid drivers license. The applicant should make any changes to the information on the card as is necessary and include all telephone numbers where they can be reached during the process. At the same time they are notified of the time and place of the "Applicant Orientation."

6) At the Applicant Orientation, the applicant is given the application packet. He/she is briefed as to how the forms need to be completed, as well as when the packet needs to be returned.

   a) The application packet includes;
   b) Personal History Statement
   c) Preemployment Background Questionnaire
   d) Records Check Form
   e) Authority to Release Information Form
   f) Notice of Tobacco Use
   g) Preemployment Drug Screening Consent Form
   h) Pension Reform Communities Notice
   i) Personal Inquiry Questionnaire (3 copies)
   j) Elimination Guidelines

7) Upon completion and return of the application packet, the Background Investigation begins.

8) Upon successfully passing the Background Investigation, the applicant is interviewed by The Board of Police Commissioners. At this time the Board of Police Commissioners may offer the applicant a conditional offer of employment, or eliminate the applicant from consideration. The applicant is notified by letter as to the outcome of his/her interview.

9) Should the applicant be given a conditional offer of employment, he/she will be scheduled for a medical exam through the Personnel Office, based upon the current City of Springfield and HRD standards.

10) Upon passing all medical examinations, the applicant is scheduled for a "Physical Ability Test" (PAT) which is administered by HRD. This test costs the applicant $50 and failure of the PAT automatically eliminates the applicant from all future lists called off that test.

11) Upon passing the PAT, the applicant is scheduled for a Psychological Screening. Should he/she pass the Psychological Screening, the applicant is notified of the time and place to appear for an Academy Orientation.

12) The applicant starts the Basic Police Academy session as a Student Officer. The Academy session which last approximately 24 weeks.

# Exhibit 2

| | | | |
|---|---|---|---|
| 324 | STARR | DAVID | 06/30/96 |
| 325 | CATELLIER | JODY | 10/15/96 |
| 326 | CATELLIER | WILLIAM | 10/15/96 |
| 327 | DANIELE | CARLA | 10/15/96 |
| 328 | MORAN | JOSEPH | 10/15/96 |
| 329 | CONDON | ANN MARIE | 10/15/96 |
| 330 | TERZI | STEVEN | 10/15/96 |
| 331 | DUDA | TRENT | 10/15/96 |
| 332 | TOSADO | JOHN | 10/15/96 |
| 333 | LAVIOLETTE | JASON | 10/15/96 |
| 334 | ROSARIO | JUAN | 10/15/96 |
| 335 | BACON | MARK | 10/15/96 |
| 336 | MILLER | REGINALD | 10/15/96 |
| 337 | FITZGERALD | SEAN | 10/15/96 |
| 338 | JOHNSON | TIYRA | 10/15/96 |
| 339 | REID | RICHARD | 10/15/96 |
| 340 | KOUROUVACILIS | SANDRA | 10/15/96 |
| 341 | TOLEDO | JULIO | 10/15/96 |
| 342 | COLLINS | MICHAEL | 10/15/96 |
| 343 | RIEF | RICHARD | 10/15/96 |
| 344 | CASILLAS | ARISTIDES | 10/15/96 |
| 345 | SLATTERY | DEREK | 10/15/96 |
| 346 | ZARELLI | THOMAS | 10/15/96 |
| 347 | FAIRLEY | KEISHA | 10/15/96 |
| 348 | TATRO | JENNIFER | 10/15/96 |
| 349 | FRANCO | DAVID | 10/15/96 |
| 350 | BRANTLEY | KIMBERLY | 10/15/96 |
| 351 | GONZALEZ | RAUL | 10/15/96 |
| 352 | HART | TOMMIE | 10/15/96 |
| 353 | RICHARD | SCOTT | 10/15/96 |
| 354 | FRANCO | SINEL | 10/15/96 |
| 355 | CARVALHO | TRACY | 10/15/96 |
| 356 | RAMIREZ | CARLOS | 10/15/96 |
| 357 | FERNANDES | MICHAEL | 10/15/96 |
| 358 | SIERRA | RAMON | 10/15/96 |
| 359 | MURPHY | LAWRENCE | 10/15/96 |
| 360 | MENDEZ | PEDRO | 10/15/96 |
| 361 | SHEEHAN | TIMOTHY | 10/15/96 |
| 362 | VIRUET | RICARDO | 10/15/96 |
| 363 | VANZANDT | EDWARD | 10/15/96 |
| 364 | FELICIANO | PABLO | 10/15/96 |
| 365 | LARRIER | JASON | 10/15/96 |
| 366 | GOGGIN | MICHAEL | 10/15/96 |
| 367 | CASAGRANDE | CONNIE | 10/15/96 |
| 368 | DONOVAN | JAMES | 10/15/96 |
| 369 | HACKETT, JR. | DENNIS | 10/15/96 |
| 370 | MOORE | MONIQUE | 10/15/96 |
| 371 | LEE | MATTHEW | 10/15/96 |
| 372 | KAKLEY | THOMAS | 10/15/96 |
| 373 | ELLIOTT | BRIAN | 04/06/97 |
| 374 | SEDERGREN | MICHAEL | 04/06/97 |

10

| | | | |
|---|---|---|---|
| 375 | BELIVEAU | BRIAN | 04/06/97 |
| 376 | TYBURSKI | STEPHEN | 04/06/97 |
| 377 | CURLEY | MARTIN | 04/06/97 |
| 378 | SHARPE | JAYME | 04/06/97 |
| 379 | COREY | JOHN | 04/06/97 |
| 380 | SEDER | EDWARD | 04/06/97 |
| 381 | REIGNER | DANIEL | 04/06/97 |
| 382 | TWINING | CHRISTOPHER | 04/06/97 |
| 383 | BERTE | WILLIAM | 04/06/97 |
| 384 | LEBLANC | DANIEL | 04/06/97 |
| 385 | DUMAS | MICHAEL | 04/06/97 |
| 386 | KENNEY, II | MARK | 04/06/97 |
| 387 | VEGA | RAFAEL | 04/06/97 |
| 388 | LABELLE | RICHARD JR. | 04/06/97 |
| 389 | LOCKWOOD | HOWARD | 04/06/97 |
| 390 | TATRO | RONALD | 04/06/97 |
| 391 | BERRIOS | ANGEL | 04/06/97 |
| 392 | MURPHY | SEAN      P | 04/06/97 |
| 393 | ESPINOSA | RUDOLFO | 04/06/97 |
| 394 | KELLY | WILLIAM | 04/06/97 |
| 395 | ASHWORTH | KEVIN | 04/06/97 |
| 396 | ESTRADA | JUAN | 04/06/97 |
| 397 | KALISH | EDWARD | 04/06/97 |
| 398 | MCCAIN | GREGORY | 04/06/97 |
| 399 | KEENAN | BRIAN | 04/06/97 |
| 400 | SHINK | NORMAN | 04/06/97 |
| 401 | BRODEUR | JOSEPH | 04/06/97 |
| 402 | DENAULT | DONALD | 04/06/97 |
| 403 | HRYCAY | CHRISTOPHER | 04/06/97 |
| 404 | BELL | KEVIN | 04/06/97 |
| 405 | KANE | DAVID | 04/06/97 |
| 406 | PEREZ | ANGEL | 04/06/97 |
| 407 | MEHRINGER | MARK | 04/06/97 |
| 408 | RIVERA | MIKE | 04/06/97 |
| 409 | SLEEPER | JASON | 04/06/97 |
| 410 | SANTA | MARTIN | 04/06/97 |
| 411 | SULLIVAN | KEVIN | 04/06/97 |
| 412 | TROMBLEY | MICHAEL | 04/06/97 |
| 413 | DUDLEY | VINCENT | 04/06/97 |
| 414 | SHULTZ | EDWARD | 03/15/98 |
| 415 | LYNCH | SCOTT | 07/13/98 |
| 416 | DIAZ | JOSE | 07/13/98 |
| 417 | DONOGHUE | CHRISTOPHER | 07/13/98 |
| 418 | BOURQUE | MATTHEW | 07/13/98 |
| 419 | COLLINS | SEAN | 07/13/98 |
| 420 | DIAZ | NORBERTO | 07/13/98 |
| 421 | BUZZELL | STEVEN | 07/13/98 |
| 422 | MCCOY | JAMES | 07/13/98 |
| 423 | ARROYO | DAVID | 07/13/98 |
| 424 | COUTURE | JASON | 07/13/98 |
| 425 | RIVAS | HERMINIO | 07/13/98 |

11

| 426 | WARREN | MICHAEL | 07/13/98 |
| 427 | HERNANDEZ | JUAN | 07/13/98 |
| 428 | HAYGOOD | JOSH | 07/13/98 |
| 429 | FOPP | STEPHEN | 07/13/98 |
| 430 | LEON-RESTO | DANIEL | 07/13/98 |
| 431 | DUCHARME | SHANNON | 07/13/98 |
| 432 | SULLIVAN | SEAN | 07/13/98 |
| 433 | HITCHCOCK | EDWARD | 07/13/98 |
| 434 | EDWARDS | DARREN | 07/13/98 |
| 435 | MARTIN | DAVID | 07/13/98 |
| 436 | STRANGE | DONALD | 07/13/98 |
| 437 | HARRIS | RODNEY | 07/13/98 |
| 438 | MARTUCCI | JEFFERY | 07/13/98 |
| 439 | GONZALEZ | RAYMOND | 07/13/98 |
| 440 | VICKERY | MATTHEW | 07/13/98 |
| 441 | LOPES | WILLIAM | 07/13/98 |
| 442 | ARPIN | SEAN | 07/13/98 |
| 443 | CANNING | CLAY | 07/13/98 |
| 444 | CAPUTO, JR. | GREGORY | 07/13/98 |
| 445 | SHARIF | AHMAD | 07/13/98 |
| 446 | BARTON | DAVID | 07/13/98 |
| 447 | LALOS | ALEXANDROS | 07/13/98 |
| 448 | WHITLEY | SHELLEY | 07/13/98 |
| 449 | DRAINVILLE | PAUL | 07/13/98 |
| 450 | ELLSWORTH | JOSHUA | 07/13/98 |
| 451 | JIMINEZ | IVYS | 07/13/98 |
| 452 | DOMINQUEZ | MARIA | 07/13/98 |
| 453 | HILL | STEPHEN | 07/13/98 |
| 454 | JARVIS | RICHARD | 07/13/98 |
| 455 | LOCHIATTO | BERARDINO | 07/13/98 |
| 456 | VILLALOBOS | GENEVIEVE | 07/13/98 |
| 457 | MAGNACCA | CHRISTINE | 07/13/98 |
| 458 | WRAY | HAMILTON | 07/13/98 |
| 459 | MAYNARD | RICHARD | 07/13/98 |
| 460 | TRUOIOLO | THEODORE | 07/13/98 |
| 461 | MILLER | SHANETIA | 07/13/98 |
| 462 | LAWRENCE | MARCUS | 07/13/98 |
| 463 | WALTER | JUSTIN | 07/13/98 |
| 464 | AGUIRRE | FELIX | 07/13/98 |
| 465 | CRUZ | ADAN | 07/13/98 |
| 466 | LOPEZ | JOHN | 07/13/98 |
| 467 | ROBLES | JOSE | 07/13/98 |
| 468 | WILSON | NATALIE | 07/13/98 |
| 469 | TRUONG | NHAC | 07/13/98 |
| 470 | PIRES | KENNETH | 11/15/98 |
| 471 | BOSWORTH | ANTHONY | 09/05/99 |
| 472 | MITCHELL | MICHAEL | 09/05/99 |
| 473 | JOHNSON | KARL | 07/09/00 |
| 474 | GOVONI | MICHAEL | 07/09/00 |
| 475 | PAYSON, III | PETER | 07/09/00 |
| 476 | ZAYAS | NELSON | 02/05/01 |

12

| 477 | RYAN | NOLAN |
| 478 | MCNULTY | MICHAEL |
| 479 | WILSON | JEREMY |
| 480 | HERVIEUX | THOMAS |
| 481 | ADAMES | LUIS |
| 482 | FELICIANO | DANILO |
| 483 | MATOS | LEONARDO |

### CIVILIAN PERSONNEL

| CALVANESE | SALVATORE R | | SENIOR COMPTROLLER |
| HOBBS-FITZGERALD | PATRICIA | | OFFICE MANAGER |
| DEMUSIS | JUDITH | A | OFFICE MANAGER |
| MILCZARSKI | BARBARA | A | PRINCIPLE CLERK & STENO |
| KENNEY | PAULA | M | SENIOR CLERK & STENO |
| PODGURSKI | MARIA | R | SENIOR CLERK & TYPIST |
| WHEELER | MELANIE | M | SENIOR CLERK & TYPIST |
| SMITH | BARBARA | | SENIOR CLERK & TYPIST |
| DAY | RACHEL | | SENIOR CLERK & TYPIST |
| CANNON | PATRICIA | | SENIOR CLERK & TYPIST |
| TADDIA | RENA | | SENIOR CLERK & TYPIST |
| FLEURY | MARY | | SENIOR CLERK & TYPIST |
| HERNANDEZ | MERITA | | SENIOR CLERK & TYPIST |
| PLACANICA | LISA | | SENIOR CLERK & TYPIST |
| WILLIS | LISA | | SENIOR CLERK & TYPIST |
| O'MALLEY | DEBORAH | | SENIOR CLERK & TYPIST |
| TEMPLEMAN | BETHANN | | SENIOR CLERK & TYPIST |
| LUNSFORD | DONNA | | SENIOR CLERK & TYPIST |
| FLORES | SONIA | | SENIOR CLERK & TYPIST |
| JORDAN | LINDA | | RECORDS CLERK |
| NORFLET | CHARLOTTE | | HMEO |
| MORRISSEY | NANCY | | COMPUTER DISPATCH INST |
| BROWN | KATHLEEN | | COMM. POLICING LIAISO |
| LOPEZ | BRENDA | | DOM. VIOLENCE COORDINATR |
| VARGAS | MILTA | | DOM. VIOLENCE ASSISTA T |
| XU | JIANSONG | | P.C. TECHNICAL SPECIALI T |
| NYGREN | ORLOW KENT | | P.C. TECHNICAL SPECIALI T |
| COOK | JOHN | | P.C. TECHNICAL SPECIALI T |
| FERNANDES | GLORIA | M | DATA ENTRY |
| SYPHER | GLADYS | M | DETENTION ATTENDANT |
| KOZAKIEWICZ | KATHLEEN | A | DETENTION ATTENDANT |
| SMITH | DAWN | K | DETENTION ATTENDANT |
| FAILEY | DAVID | | DETENTION ATTENDANT |
| BURROUGHS | ANN | | DETENTION ATTENDANT |
| SUSE | GEORGE | | DETENTION ATTENDANT |
| FIGIEL | CARRIE | | DETENTION ATTENDANT |
| PEPE | TAMMY | | DETENTION ATTENDANT |
| HOGAN | WILLIAM | J | MOTOR EQUIPMENT REPAIRM N |
| TIMMERMAN | ROBERTC | | MOTOR EQUIPMENT REPAIRM N |
| NOBLE | ANDREW | | MOTOR EQUIPMENT REPAIRM N |
| DAMRAUSKAS | DANIEL | C | ELECTRICAL TECHNICIAN |

13

# Affidavit of Julio Toledo

## AFFIDAVIT

1.    I, Julio M. Toledo, Jr., am employed as a Springfield police officer and have been a member of Local 364 of the IBPO since my date of hire on February 21, 1997.

2.    On Wednesday, February 25, 2004, I attended a meeting of the patrolmen's union at the Springfield Police Department.

3.    At that meeting, union member Thomas Zarelli stated to all members in attendance that during December 2002, he (Thomas Zarelli) notified then-union president, Edward McDonald, that the seniority as listed on the annual roster was incorrect.

4.    Thomas Zarelli quoted then-president McDonald as stating he was not concerned about the issue because his tenure as president was ending and that Zarelli should speak to president-elect Thomas Scanlon, in the presence of Richard Trombley.

5.    Zarelli further stated that he spoke to president-elect Scanlon who replied that he (Scanlon) had other matters of importance and he (Scanlon) could not look into the issue and for Zarelli to look into the matter himself.

6.    Zarelli then stated to the union members present at the meeting of February 25, 2004, that he (Zarelli) traveled to the Civil Service office in Boston and retrieved information from Civil Service relative to seniority rankings.

7.    Zarelli stated upon returning from the Civil Service office in Boston that he gave the information to then-president Thomas Scanlon in January, 2003, supporting his position of incorrect seniority ranking for patrolmen.

8.    I was present at the meeting on Wednesday, February 25, 2004, at which Thomas Zarelli stated to all members present in the open meeting the above facts.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 29th DAY OF APRIL, 2004.

JULIO M. TOLEDO, JR.