# United States District Court
## District of Massachusetts

Kevin Bell, Juan R. Estrada, David Franco,
Tommie O. Hart, Josh C. Haygood, Jason E.
Larrier, Howard Lockwood, Leonard Matos
Jr., Greg McCain, Pedro R. Mendez, Angel
Perez, Herminio Rivas Jr., Martin Santa,
Julio Toledo, Rafael Vega

CIVIL ACTION NO.
3:04-cv-30163-MAP

PLAINTIFFS

v.

IBPO, Local 364 and City of Springfield

DEFENDANTS

### CITY OF SPRINGFIELD'S MEMORANDUM IN OPPOSITION TO MOTION TO AMEND COMPLAINT; OPPOSTION TO MOTION FOR PRELIMINARY INJUNCTION; AND IN SUPPORT OF MOTION TO STRIKE PROPOSED COMPLAINT

### Introduction

The City of Springfield files this memorandum in response to the plaintiffs' second motion to amend the complaint. The court denied the first motion, and ordered the plaintiffs to submit a revised complaint.

The second proposed amended complaint suffers from similar deficiencies to the first proposed amended complaint. While setting forth less vague allegations, it does not provide adequate notice of the claims for liability proposed against the City of Springfield and does not present allegations upon which injunctive relief can be granted. The City respectfully requests that the Motion to amend be denied; the motion for preliminary injunction be denied and the proposed amended complaint be stricken.

### Claims Summary

Claim I is entitled "To Usurp Castro v. Beecher is a Violation of Public Policy". It alleges the City of Springfield Police Department "entered into a collective-bargaining

agreement that is contrary to public policy" and has done so "willfully, wantonly, maliciously and in reckless disregard for Plaintiffs' rights" thereby causing damages.

Claim II is entitled "Breach of Statutory Duty of Fair Representation" and does not contain any facts, which relate to the City, other than as a party to the contract under which the "union duty of fair representation" arises.

Claim III is entitled "Breach of Duty of Fair Representation by Failure to Assert Plaintiffs Rights" and alleges that the City of Springfield Police Department was "legally committed to present evidence governed by Castro v. Beecher consent decree" and alleges that the arbitrator was "never informed of the hiring practices mandated by the federal consent decree" and did so "willfully, wantonly, maliciously and in reckless disregard for Plaintiffs' rights" causing damage

Claim IV is entitled "Intentionally Creating a Hostile Work Environment" and alleges that the City of Springfield Police Department "unlawfully failed to refuse to participate in an unlawful arbitration proceeding and failure to seek judicial review of unlawful arbitration created a hostile work environment" causing damage.

Claim V is entitled "Defendants, City of Springfield Police Department and IBPO, Local 364 had a duty to seek judicial review of arbitration proceedings and to promptly disclose and disseminate all truthful information that would be material to the arbitration proceedings". Plaintiffs' allege these actions were "willfully, wantonly, maliciously and in reckless disregard" of their rights and caused damages.

Claim VI is entitled "Breach of Plaintiffs' Castro v. Beecher Contractual Rights" and alleges this caused damage.

**Motion to Strike**

The proposed complaint does not appear to comply with the formalities of pleading

rules. For example, the named plaintiffs are not identified in the proposed complaint, (neither in the caption, nor the body) although it is assumed, for purposes here, that the originally named plaintiffs listed on the docket are continuing as plaintiffs.

Also, the "Springfield Police Department" named in the caption is a misnomer, as the Department does not have any legal existence authorizing it to be a party to a lawsuit or to contracts, although the City of Springfield itself has such authority, acting through its Police Department and the Commission, which acts as appointing authority.

The complaint refers to a request for "declaratory and injunctive relief" and cites to a "consent decree between KB Home and the Unites States of America" as well a 28 U.S.C. § 1331 in the "jurisdiction and venue" paragraph 6 of the complaint. The complaint improperly contains an *ad damnum*

"[I]f, after opportunity to correct deficiencies in the allegations, a plaintiffs "complaints are so hopelessly general that they could give no notice of [the] claims" then the complaint is properly dismissed. *Pavilonis v. King*, 626 F.2d 1075, 1078 (1st Cir.1980) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). In other words, leniency applies to the formalities, not the facts, of a cause of action." Here, a review of each claim indicates it should be stricken based on the failure to state any cognizable claim as well as issues of mootness, ripeness, and abstention.

### Claim I "To Usurp Castro v. Beecher is a violation of public policy"

In the introductory paragraphs of the complaint (¶ 4) plaintiffs complain that the city must be stopped from "reassigning badge numbers in direct conflict with this Court's 1973, Consent Decree enumerated in *Castro v. Beecher*". According to plaintiffs (¶ 29) this "reassignment of badge numbers strips minority officers of their seniority". These allegations require a discussion of the *Castro v. Beecher* history.

### Castro v. Beecher

The case of *Quinn v. City of Boston*, 325 F.3d 18, (1st Cir. 2003) provides a description:

> "In the early 1970s, two suits were brought against a number of municipalities subject to the Massachusetts Civil Service law (now codified at Mass. Gen. Laws ch. 31, §~ 1-77). The suits alleged that the municipalities engaged in discriminatory recruitment and hiring practices whilst staffing their respective fire departments. These actions culminated in the entry of an omnibus consent decree that influenced the manner in which the affected municipalities could recruit and hire firefighters. *Boston Chapter, NAACP, Inc. v. Beecher*, 371 F. Supp. 507, 520-23 (D. Mass.1974) *(Beecher I)*. The decree was affirmed on appeal. *Boston Chapter, NAACP, Inc. v. Beecher*, 504 F.2d 1017, 1028 (1st Cir.1974) *(Beecher II)*, cert. denied, 421 U.S. 910, 95 S. Ct. 1561, 43 L.Ed.2d 775 *(1975)*. It has been in effect for nearly thirty years."

Under the decree, the civil service eligibility list was assembled according to the procedures specified. *See Beecher*, 371 F. Supp. at 522-23. Briefly stated, those procedures stipulated that the candidates placed on the list must have passed a properly validated qualifying examination and otherwise have met all eligibility requirements for the position. Beyond that point, the list was to consist of one minority candidate (i.e., black or Spanish-surnamed) for each white candidate. The decree contemplated the continued use of statutory preferences ceding pride of place to veterans, children of deceased or permanently disabled firefighters, and the like, *see, e.g.*, Mass. Gen. Laws Ann. ch. 31, §§ 26, 40 (1992), even if those persons achieved lower test scores than other qualified white candidates.

As stated in *Mackin v. City of Boston*, 969 F.2d 1273, 1274 (1st Cir. 1992), "the *Beecher* decree was intended to rectify a situation in which many fire departments within Massachusetts had remained lily-white, or nearly so, despite dramatic increases in the African-American and Hispanic populations. The decree sought to accomplish its goal by affirmative action, i.e., by fostering a hiring regime that accorded race-based preferences to blacks and Spanish-surnamed individuals." *Mackin, Id.* at 1274.

Each of the affected departments was to remain subject to the strictures of the decree (and, thus, to accord race-based preferences through the adjusted list) until such time as that department met a general benchmark established by the decree: the attainment of parity (or, at least, rough parity). *See Beecher I,* 371 F. Supp. at 523 (providing for release from the decree "[a]s a city or town achieves a complement of minorities commensurate with the percentage of minorities within the community"). The meaning of this criterion, and the manner in which it is to be gauged, are questions that have permeated the *Beecher* litigation from the outset.

Under the consent decree, the personnel administrator for the Commonwealth of Massachusetts Human Resources Division has certified minority and non-minority candidate lists for firefighter and police vacancies. Over time, the Decree has been supplemented by several consent decrees designed to implement administrative procedures for offering examinations, establishing eligibility lists, releasing municipalities from continuing judicial oversight, and the like. Unlike some 30 or more departments which heretofore met the goals of the Decree and gained release from its constraints, the City of Springfield ("City") remains under its aegis. Against this backdrop, plaintiff's claim with regard to the reassignment of badge numbers and the impact seniority of badge numbers has on employment must be viewed.

**Arbitrator's decision**

The state's statute governing lay offs implements a seniority based, "last-hired, first-fired" scheme for civil service employees. Mass. Gen. Laws Ann. ch. 31, § 39. Based on the statutory scheme, seniority in the Springfield Police Department determines the order of lay-off, shift assignment, vacation eligibility, and other benefits, and is related to badge numbers. The Arbitration decision, which is the subject matter of this litigation, arose because the City believed it was required to readjust seniority after the hiring process to reflect the *Castro v. Beecher* consent decree requirements. This is explained in the following narrative history.

### Hiring in Springfield Police Department

For many years prior to 1994 there was a question as to the manner in which seniority dates, and consequently badge numbers, were assigned. The seniority language in the collective bargaining agreement in 1994, based on actual Civil Service Exam score, was not followed, and apparently had not been followed "for many years."

During negotiations for a contract, to begin in 1995, the City of Springfield, and the International Brotherhood of Police Officers Local, 348 (hereinafter Local 348 or the Union), negotiated changes to the seniority provision found in the Collective Bargaining Agreement. The Union made several suggestions as to the potential language, and the City ultimately agreed to a change in Article 7.02 of the contract. (Exhibit 1 to the Cochrane Aff.). This language change was implemented for the Collective Bargaining Agreement which began in June of 1995. The same language was also maintained in the successor agreements to the 1995 contract, which ultimately ran through 2003 and has not been changed in any subsequent contract. In short, the disputed language, which was the subject matter of the Arbitration, has been contained in contracts for approximately eight years.

As previously noted, the City of Springfield operates under the federal consent decree, issued in the *Castor v. Beecher* case, which promotes racial balance in the hiring of Police Officers. Under the decree the Department must engage in a process, which promotes "one-for-one" hiring, meaning one minority selected for every majority candidate. When the City intends to hire, the Civil Service certification list received from the Civil Service Commission and the Commonwealth's Human Resources Division is in a "one-for-one" format when received from Civil Service.

The hiring process after receipt of the Civil Service list, then requires a candidate to appear and sign the list. An orientation is done, and he or she is given an application package

with all of the forms necessary to be completed for employment, as well as guidelines for elimination, which sets forth those circumstances that will disqualify them from employment. They are required to fill out the paperwork and return it within a set period of time.

A background check is then performed. If they are not eliminated as a result, they are given an interview in front of the City's Board of Police Commissioners. At that point, the candidate is either offered conditional employment or eliminated or bypassed.

The applicants are notified by letter as to the outcome of the interview. Those offered conditional employment will be scheduled for a medical examination, upon completion, they will take a physical abilities test administered by the state HRD.

After the physical test is successfully completed, a psychological screening is ordered. Passing the psychological screening then leads to qualification for a 24 week police academy. Upon entrance to the academy, the original civil service list was redisbursed.

Hiring is always "1:1", but due to a number of circumstances, the final graduating class might not represent the original "1:1" hiring. When the list of appointed officers in question would become finalized, the City would re-disburse the list to reflect a racially balanced, "one-for-one" list. In essence the Civil service list was disbursed in a one-for-one fashion twice. Once by the Civil Service Commission, after candidates took and passed the examination, and second by the City of Springfield once officers had officially been hired and were about to enter the Police Academy and thereby obtain a place on the seniority list. Captain William Cochrane, the supervisor at the police academy during the relevant time period, was involved in the second re-disbursement.

Since before 1994, the City has used the second list as a method of computing seniority. (Arbitration Testimony of Captain Cochrane). This second list in most instances became the roster that was used for seniority purposes. (Please See Exhibit 2, Cochrane Aff., Rosters)

Essentially, the Department would use the rank on the Civil Service certification list, and then re-disperse the list to reflect a minority/majority breakdown.

The union ultimately grieved the City's method of computing seniority and the matter proceeded to arbitration. The union alleged that this second re-disbursement of the list, done for the purposes of racial balance, was a violation of Article 7.02 of the contract. This grievance lead up to the Arbitration decision at issue in this case.

The issue came to a head during a budget crisis which occurred in 2003. On approximately February 7, 2003 the City of Springfield, due to severe budgetary restraints, was forced to lay-off seventy-five (75) police officers. As one can imagine, this had the trickle down effect of many transfers, to and from, a variety of shifts and bureaus. The Department used the then current roster to determine seniority for purposes of these lay-offs, transfers and assignments. At no time prior to, or immediately subsequent to the lay-offs did the union suggest that the seniority list used by the City was inaccurate or in violation of the contract.

On several occasions between 1994 and 2003 the City distributed rosters to all patrolmen. These rosters provided notice to the patrolmen as to their seniority in comparison to all other employees in the Union. At no time between 1994 to 2003 did any employee, nor any union representative, file a grievance disputing the method in which the City computed seniority. On August 10, 2003 the union filed a request for documentation, specifically the Civil Service certification from which all officers were appointed since July 1, 1995. There is no dispute that these were public records available, at all relevant times, through the Civil Service Commission in Boston. In its correspondence dated August 10, 2003 the union stated that some members have "raised questions regarding the badge number/seniority of members of Local 364 IBPO." (Arbitration Union Exhibit 1). On December 2, 2003, the City provided the Union with much of the requested documentation. (Arbitration Union Exhibit 4). A Grievance on this matter was

ultimately filed by the Union on February 24, 2004.

As noted in the Affidavit of Julio Toledo, (Exhibit attached hereto) on February 25, 2004 the Union held a meeting of members at the Springfield Police Department. At the meeting, union member Thomas Zarrelli indicated to all members in attendance that in December of 2002 he had told former Union President Edward McDonald that the seniority as listed on the annual roster was incorrect. Furthermore, Officer Zarrelli stated that he retrieved the Civil Service lists in question from Boston, and presented them to President Thomas Scanlon in June of 2003.

Additionally, it was presented at the Arbitration hearing that Patrolman Shawn Kearney, a union member, was one of the individuals who, in part, prepared the Civil Service lists during his employment at the Police Academy. (Testimony of Captain Cochrane at Arbitration). Captain Cochrane also testified that many other union members worked at the academy and assisted in the compilation of documents in controversy.

The Arbitrator ruled that the "second redisbursement" performed under the direction of Captain Cochrane and other management personnel in the police department (in the belief that such a readjustment was required by the *Castro v. Beecher* consent decree) was a violation of the Collective Bargaining Agreement. Pursuant to that Arbitration, the City stands ready to adjust seniority, without reference to a "second redisbursement." The impact of this readjustment will have a random affect, with some minority officers rising on the seniority list, while others will be lowered. As to the plaintiffs in this case, it is believed that they were beneficiaries of the "second redisbursement" which the city had been performing, and it is believed that they will all be subject to a lowering of their seniority as a result of the Arbitrator's order. However, from the pleadings to date, there is uncertainty as to the actual impact. In any event, there is little likelihood of any of them being laid off From the roster of police department employees, it is clear that each of the plaintiffs have been employed a sufficient length of time that even if future

layoffs were to occur, (and there is no evidence that any layoffs are contemplated) their employment would be secure.

### Applicable law

The *Castro v. Beecher* consent decree does not discuss seniority or layoffs. However, the subject of layoffs has arisen previously in the *Castro v. Beecher* litigation. In *Boston Chapter, NAACP v. Beecher*, 679 F.2d 965 (1st Cir.1982) (*Beecher I*), the First Circuit affirmed a district court order modifying Boston police and fire department seniority rules, so as to prevent the departments from laying off too many minority officers. 522 F.Supp. 873. The parties sought Supreme Court review. The Supreme Court remanded the case to the First Circuit for reconsideration in light of a later-enacted state law, the Tregor Act, 1982 Mass. Acts ch. 190, § 25, which removed the imminent threat of layoffs, reinstated all officers laid off, and provided them with retroactive competitive seniority. 461 US 477, 103S Ct 2076. Upon reconsideration, the First Circuit found that the Tregor Act ended the controversy between the parties and rendered the case moot. The First Circuit then ordered the district court's injunction vacated. *Boston Chapter, NAACP v. Beecher*, 716 F.2d 931 (1st Cir.1983) (*Beecher II*). The parties again sought Supreme Court review.

While the petition for certiorari in *Beecher II* was pending, the Supreme Court decided a factually similar case, *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). In *Stotts*, the Supreme Court examined a "seniority/racial minority layoff" problem much like the one at issue in *Beecher II*. It ruled that a state law similar to the Tregor Act did not render the controversy moot; and on the merits, it held a similar district court injunction unlawful. The Supreme Court remanded the case to the First Circuit again and asked the court to reexamine the "mootness" holding in light of *Stotts*. *Boston Firefighters Local 718 v. Boston Chapter NAACP* _ U S ----;104 S Ct 3576 82 L Ed 2d 874 (1984) On reconsideration the case, the First

Circuit found that it differed from *Stotts* in respect to mootness, and the mootness decision was undisturbed.

Here, there is even less of an actual case and controversy than in the Boston case. There, the cancellation of layoffs was sufficient to render the case moot. Here, the plaintiffs do not even allege any layoff is threatened. As all of the officers originally named as plaintiffs have been employed as officers since 1996, the chances of any of them ever being laid off is very remote. However, without any threat of layoff looming, the First Circuit holding of a lack of case or controversy would be applicable here.

Federal courts do not issue advisory opinions. *Maher v. Hyde,* 272 F.3d 83, 86 (1st Cir.2001). Rather, the United States Constitution "confines the federal courts' jurisdiction to those claims which embody actual 'cases' or 'controversies.'" *Id.* (citing U.S. Const. art. III, § 2, cl. 1). To be justiciable, an actual case or controversy must exist between the parties at all stages of litigation, not merely on the date the action was first initiated. *Thomas R. W. v. Massachusetts Dep't of Education,* 130 F.3d 477, 479 (1st Cir.1997). If the case and controversy requirement is not satisfied, the matter is moot, and must be dismissed. *Cruz v. Farquharson,* 252 F.3d 530, 533 (1st Cir.2001). A matter is deemed moot "when the issues presented are no longer live or when the parties lack a legally cognizable interest in the outcome." *Id.*

Here, while plaintiffs claim "damages" no harm is set forth or referred to. There is no loss of pay or other benefit, and there is no evidence that any loss is imminent. While the complaint alleges the City of Springfield Police Department "entered into a collective-bargaining agreement that is contrary to public policy" and has done so "willfully, wantonly, maliciously and in reckless disregard for Plaintiffs' rights" thereby causing damages, beyond the conclusory remarks there is no explanation of the harm encountered or expected.

The plaintiffs do not qualify to the exception to the mootness rule. A Plaintiff may

pursue its cause of action on federal courts if it can show that its cause of action is "capable of repetition, yet evading review." *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975). The First Circuit has described this exception to the mootness doctrine as follows: In order to qualify for this narrow exception to the mootness doctrine, a plaintiff must show that (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again. *Gulf of Maine Fisherman's Alliance v. Daley*, 292 F.3d 84, 89 (1st Cir.2002) (citing *Weinstein*, 423 U.S. at 149, 96 S. Ct. 347). Neither are met here.

Even if the matter did set forth an actual controversy, *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, (1984) provides controlling precedent requiring denial of the injunction and dismissal of the complaint. The *Castro v. Beecher* consent decree was instituted for alleged racial discrimination in recruitment and certification practices of city police and fire departments, not seniority or layoffs. Application of the consent decree to seniority and layoffs would require modification of the decree. As noted in *Stotts*, the "scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it" or by what "might have been written had the plaintiff established his factual claims and legal theories in litigation." Citing *United States v. Armour & Co.*, 402 U.S. 673, 681-682, 91 S. Ct. 1752, 1757, 29 L.Ed.2d 256 (1971).

Here, the *Castro v. Beecher* consent decree, as the District Court and First Circuit and Supreme Court recognized, does not mention layoffs or demotions within the four corners of the decree; nor is there any suggestion of an intention to depart from the existing seniority system or from the City's arrangements with the Union.

As the Supreme Court stated in *Stotts*:

> "We cannot believe that the parties to the decree thought that the City would simply disregard its arrangements with the Union and the seniority system it was then following. Had there been any intention to depart from the seniority plan in the event of layoffs or demotions, it is much more reasonable to believe that there would have been an express provision to that effect."
>
> *Stotts, supra,* 467 U.S. at 574.

As in *Stotts* "[t]he argument that the injunction was proper because it carried out the purposes of the decree is equally unconvincing. The decree announced that its purpose was to remedy past hiring and promotion practices of the Department, and to settle the dispute as to the appropriate and valid procedures for hiring and promotion." *Id.*

The consent decree provides the agreed-upon remedy, but as noted in *Stotts*:

> it is reasonable to believe that the "remedy", which it was the purpose of the decree to provide, would not exceed the bounds of the remedies that are appropriate under Title VII, at least absent some express provision to that effect. As our cases have made clear, however, and as will be reemphasized below, Title VII protects bona fide seniority systems, and it is inappropriate to deny an innocent employee the benefits of his seniority in order to provide a remedy in a pattern-or-practice suit such as this.
>
> *Id* at 575.

*Stotts* noted that neither the Union, nor its non-minority employees were parties to the suit when the decree was entered. Hence the Court held "entry of that decree cannot be said to indicate any agreement by them to any of its terms. Absent the presence of the Union or the non-minority employees and an opportunity for them to agree or disagree with any provisions of the decree that might encroach on their rights, it seems highly unlikely that the City would purport to bargain away non-minority rights under the then-existing seniority system." Based on the finding of mootness in the First Circuit once the threat of lay offs was removed, and the holding in *Stotts*, this court should conclude that an injunction would not be proper here.

As noted by the Court in *Stotts* the district court did not have inherent authority to modify the decree when an economic crisis unexpectedly required layoffs which, if carried out as the

City proposed, would undermine the affirmative action outlined in the decree and impose an undue hardship on respondents. This was true, the court held, even though the modification conflicted with a bona fide seniority system adopted by the City.

The Supreme Court noted this was an erroneous conclusion and stated:

> Section 703(h) of Title VII provides that it is not an unlawful employment practice to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority system, provided that such differences are not the result of an intention to discriminate because of race.
> *Id at 578.*

Plaintiffs do not allege and, as pointed out in the affidavit of Captain William Cochrane, previously supplied to the court, no layoffs are being considered at this time, and, while seniority is an issue important to all officers, there are no allegations, other than a pending reassignment of seniority pursuant to the Arbitrator's award, that any of the plaintiffs are facing layoffs or a failure to promote, or any other adverse employment action arising from the planned compliance with the Arbitration award. In fact, nowhere in the complaint does any plaintiff state exactly how their current seniority will be affected or the specifics of any expected impact.

### Claim II entitled "Breach of Statutory Duty of Fair Representation"

This claim does not contain any facts, which relate to the City, other than as a party to the contract under which the Union "duty of fair representation" arises. The City is not a party to this claim other than with regard to the court fashioning a remedy which affects its ability to comply with the Arbitrator's Award. However, there are reasons, which indicate the court should not exercise jurisdiction at this time. In addition to the lack of an actual controversy, as discussed above, the ripeness doctrine is applicable here.

A denial of a preliminary injunction at this stage, will lead to a reassignment of badge numbers, and therefore adjustments to seniority. Any officer aggrieved by a loss of seniority

should seek to pursue the grievance and arbitration remedies available under the collective bargaining agreement, appeal under M.G.L. c. 150E, or civil service remedies under M.G.L. c. 31 available for review of such action. If any Union member feels they have not been fairly represented by the Union, he or she may seek redress in the Massachusetts Courts or the Massachusetts Labor Relations Commission. In *Leahy v. Local 1526, American Federation of State, County and Mun. Employees,* 399 Mass. 341, 504 N.E.2d 602 (1987), the Supreme Judicial Court of Massachusetts, held that the Massachusetts Superior Court had concurrent jurisdiction with the Massachusetts Labor Relations Commission over breaches in a Union's duty of fair representation.

The lack of ripeness is an additional ground for the court to not exercise jurisdiction at this time. The Declaratory Judgment Act, 28 U.S.C. § 2201-2202, allows a federal court to award declaratory relief when an actual case or controversy is present. As the First Circuit observed in *Ernst & Young v. Depositors Economic Protection Corporation,* the Declaratory Judgment Act does not itself confer subject matter jurisdiction, but rather "makes available an added anodyne for disputes that come within the federal courts' jurisdiction on some other basis." 45 F.3d 530, 534 (1st Cir.1995). Because this Act offers litigants "a window of opportunity, not a guarantee of access," the courts ultimately must decide, and have substantial discretion in determining, whether declaratory relief is appropriate in a given action. Id. In evaluating whether declaratory relief is warranted, one critical consideration is whether the cause of action is ripe for judicial review. If it is determined that the declaratory judgment action before the court is unripe for judicial determination, there is no alternative but to dismiss the case. *Id.* at 535.

As the United States Supreme Court noted in *Abbott Labs. v. Gardner,* the ripeness doctrine exists to "prevent the courts, through avoidance of premature adjudication, from

entangling themselves in abstract disagreements." 387 U.S. 136, 148-49, 87 S. Ct. 1507, 18 (1967). Thus, courts should dismiss declaratory judgment claims as unripe unless "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Gun Owners' Action League, Inc. v. Swift,* 284 F.3d 198, 205-06 (1st Cir.2002) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S. Ct. 510 (1941). To determine whether or not a particular declaratory judgment claim is ripe for judicial action, the United States Supreme Court instructs the district courts to examine: (1) "the fitness of the issues for judicial determination," and (2) "the hardship to the parties of withholding court consideration." *Abbott Labs.,* 387 U.S. at 149, 87 S. Ct. 1507. In discussing these factors, the First Circuit has observed: "[F]itness typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed, whereas hardship typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties." *Rhode Island Ass'n of Realtors, Inc. v. Whitehouse,* 199 F.3d 26, 33 (1st Cir.1999)(internal quotation marks omitted). For an action to be ripe, both prongs of this test must be satisfied, although a strong showing on one may compensate for a weaker showing on the other. *Ernst & Young,* 45 F.3d at 535. Neither prong has been established here.

Even if there was sufficient ripeness, this court should abstain from taking jurisdiction at this time until remedies available under state law, such as collective bargaining agreement, arbitration, civil service law, M.G.L. c.150E, Massachusetts Labor Relation Commission, or the superior court pursuant to a petition for certiorari M.G.L c.249, have been exhausted. *Younger vs. Harris,* 401 U.S. 37, 91 S.C. 746 (1971)

**Claim III "Breach of Duty of Fair Representation by Failure to Assert ~Plaintiff's Rights"**

This claim alleges that the City of Springfield Police Department was "legally